### SWIFT et al. v. PHILADELPHIA & R. R. CO.

(Circuit Court, N. D. Illinois. November 5, 1894.)

1. COMMON LAW OF THE UNITED STATES.

There is, within the boundaries of the several states, no common law of the United States, as a distinct sovereignty, neither the constitution nor congress having adopted that law, and the power of the nation to make laws, within the field of power assigned to it by the constitution, being exercised only by express enactments of congress, or by treaties.

2. CARRIERS—UNREASONABLE RATES—INTERSTATE COMMERCE ACT—PLEADING.

An action will not lie against a carrier to recover back freight exacted in excess of a reasonable rate, impliedly contracted for, upon shipments made after the passage of the interstate commerce act, in the absence of an averment that no rates were published and in existence as required by that act.

Action at law by Swift and others against the Philadelphia & Reading Railroad Company. On motion for leave to withdraw pleas, and file demurrers to the declaration.

A. H. Veeder and Mason B. Loomis, for plaintiffs.

Ullman & Hacker and Osborn & Lynde, for defendant.

GROSSCUP, District Judge. This, with other cases involving the same questions, now comes on, upon motion of the defendant, for leave to withdraw pleas, and file demurrers to the declaration. The disposition of the motion is dependent upon whether the declaration

sets out a good cause of action, and is practically, therefore, a demurrer to the declaration. The declaration differs in some respects from its predecessor, but, before entering upon the effect of this difference, I propose to revert to the original questions discussed in my former opinion. Swift v. Railroad Co., 58 Fed. 858. I do this because the conclusions of that opinion have been persistently and ably combated, not only in current legal periodicals, but also by some of the courts of the other circuits.

The conclusions to which I arrived in the former opinion may be summarized as follows: The right to recover from common carriers for unreasonable exactions must be found in some positive law of the land, applicable to the case in hand. Such a prohibition is in fact found in the common law; but it is not applicable to the case in hand, unless there be a common law of the United States, as a distinct sovereignty, because the regulation of the rates upon which the suit is dependent is within the scope of interstate commerce, and an exclusively national affair, in which the need of uniformity is imperative. There is no common law of the United States, as a distinct sovereignty; and there being no pronouncement of congress upon this subject, either expressly or impliedly, outside of the interstate commerce act, and this action not having been brought under the interstate commerce act, there is no law, either of the United States or the state, applicable to the case in hand, and there can therefore be no recovery.

The only link in the foregoing summary that has met with serious objection is the one which affirms the nonexistence of a United States common law. Indeed, it is conceded that unless a prohibition against the exaction of unreasonable rates is to be found in the body of the laws in force in the United States, outside of the scope of state jurisprudence, an action such as this cannot be sustained in the courts, either of the United States or the states, for, confessedly, the right to sustain them in the courts of the states is predicated upon the jurisdiction of state courts, in most instances, to enforce personal rights growing out of United States law. In my former opinion, I assumed that there was no common law of the United States, basing that assumption upon the repeated declarations of the supreme court. These declarations, I confess, were not decisive of the particular cases in which they occurred, and have not been accompanied by any discussion of the considerations upon which they are founded; but throughout the literature of that tribunal they have occurred often enough, without even the suggestion of a probable controversy, to justify their acceptance as the settled pronouncement of the court. I propose now, however, to consider the proposition as if it were wholly original and undecided.

Assuming that the regulation of freight rates upon interstate commerce is exclusively a national affair, is there any law of the United States applicable to the case in hand, except such as may be found to have arisen from the legislation of congress? Is there any common-law prohibition against unreasonable rates? Is there any United States common law at all? This inquiry can only be answered by taking a rapid glance at the whole sweep of our dual sys-

tem of government, and its legal settings upon the jurisprudence of the past.

What is law? In the sense under review, it is a rule of civil conduct prescribed by the supreme power in the state. Mere definitions of right and wrong are not necessarily law. They may be so manifestly just that they ought to control civil conduct, but the citizen is under no legal obligation to obey them unless they are the expressed command of the supreme power in the state. A rule of civil conduct, to have the force of law, must emanate from some power that is supreme in the field to which the rule belongs. When we would know what the law is, therefore, we must inquire always from what power it proceeds, and the right of that power to prescribe it.

No one doubts the existence of some law of the land everywhere. No plain or valley, no nook or corner, to which the dominion of man has extended itself, is without some law of the land. Indeed, law is the breath of dominion. Its commands are to be found in the express enactments of the sovereign legislative bodies, in the body of our judicial decrees, and in those ancient systems of law to which these later emanations are only supplementary. The last named were brought to the shores of America by the feet of the early emigrants; by the Englishmen, the common law; and, by the Frenchmen and Spaniards, the civil law. Each of these,—the civil and the common law,—within the respective boundaries into which they have settled, constitutes the fundamental rules of civil conduct; and there is no inch of our soil in which one of them is not in force. But, as we have seen, law is not simply a rule of civil conduct, but a rule prescribed by the supreme power in the state. Now, the supreme power of the state is, with us, divided. The line of division is not territorial, but topical. Each inch of soil is subject to the rule of two powers of state, overlapping each other in some respects, but never conflicting, and divided always according to prearranged constitutional adjustments. In some fields the nation is the sole power to prescribe rules of conduct, in other fields that power is exclusively in the state, and in still other fields it is concurrent. It is plain that in the first of these fields the emanation of a rule of conduct from the state, as, in the second, a like emanation from the nation, would not have the effect of law. Neither, in the field of the other, is a power in the state. The nation has not the power to prescribe rules of civil conduct within the field exclusively belonging to the state. The state has not the power to prescribe rules within the fields exclusively belonging to the nation. From each of these two fields the nation and the state, as the case may be, is excluded as a lawgiver. Now, this must apply as well to the system of law to which the sovereign succeeds as to that which it immediately creates; to the common or civil law as well as to that which comes from its own legislative or judicial will. In other words, the state or nation, having no power to give law in the fields exclusively belonging to the other, logically, can have succeeded to no law applicable to such fields. Neither can have a common law or a civil law within fields to which it can extend no law at all.

But the contention is that, the lawgiving power being divided topically between state and nation by the constitution, each of the participants is both the rightful current lawgiver, and the rightful successor to the common law, in the specific field apportioned to it; from which it would follow that the common law, like its own legislation, is prescribed by the state as a rule of civil conduct within the field of powers belonging to the state, and by the nation within the field of powers belonging to the nation. In other words, that the common law or civil law, as the case may be, prevails everywhere, and on every subject, but the source of the command is national or state according to the line of demarkation between the fields of power of the nation and state. This premise accepted, it would follow that the nation, having power to regulate interstate commerce, has succeeded within that field, as sovereign and lawgiver, to the commands embodied in the common law, and that within that field the common law, attributable to the nation, as sovereign, is in force. The error, if there be any, is in the assumption of the premise. It is true that the state has, by succession or adoption, prescribed the common law to its citizens upon subjects within the field of power of the state. Whether the common law would prevail within the state in the absence of express adoption by statute, it is not now necessary to discuss. It is true, also, that upon subjects wholly beyond that field the state can prescribe no such rules of conduct. But it is not necessarily true that within its field of mere power the nation has succeeded to or adopted any code of laws as rules of civil conduct, except those to be found in its legislation. There is no express adoption of any system of laws by the constitution or by statute, and the theory of the national government does not necessarily imply that it, as sovereign, succeeds to any system of laws. The inquiry is one of fact, rather than speculation, and is to be solved by the intendments of the constitution. The inquiry is whether the constitution contemplated that within its field of power the nation should succeed, as sovereign, to the common law, or whether, within that field, no law should be prescribed by the nation, except by express or implied enactment.

It is plain to me that, so far as the nation is coterritorial with the states, the latter was intended. The great bulk of governmental regulation was meant to be left to the states. The field of power conferred upon the nation, outside of that essential to its functions and defense as a nation among nations, is principally a field of bare power. Over this field of bare power, unenforced by congressional enactment, the powers of the state overlap. In these fields of bare power there are two sovereigns,—the state until the nation acts, the nation only after it acts. Out of this has grown up the doctrine of concurrent jurisdiction, now too firmly fixed to be debated, much less denied. Thus, notwithstanding the power of congress to establish uniform laws on the subject of bankruptcy, or to fix the standard of weights and measures, or to regulate interstate commerce, the states have, in the absence of national laws in enforcement of these powers, been permitted to establish their own systems of bankruptcy, their own standards of weights and measures, and their

own regulation of the great multitude of incidents to interstate commerce. It is settled constitutional law that over these fields, in the absence of congressional enactment, the laws of the state—both those that grow out of legislation and those that have come over from the common law—are the law of the land. And thus it is that largely within the field of even the express powers of the nation, the laws of the state have the primary place, and are only excluded when congress so wills by express legislative enactment.

Now, what consequences follow if it be assumed that there is a common law of the nation,—rules of civil conduct prescribed by the nation in all fields of its constitutional power? The legislature of Illinois has adopted the common law, so far as it is applicable and of a general nature, and all acts of the British parliament made in aid thereof prior to the fourth year of James the First, exclusive of designated acts of parliament. We may assume, for illustration, that the common law of the United States, if there be such, within the fields of bankruptcy, of standards of weights and measures, and of interstate commerce, is definable in the same terms. There exists, then, a common law of the United States over the subject-matter of bankruptcies, standards of weights and measures, and commerce between the states, for laws relating to all of these subjects had grown up and were well established in England prior to the fourth year of the reign of James the First. Is such transplanted jurisprudence the law of the United States? Have its mandates been prescribed by the nation as rules of civil conduct? If so, how is the field still left open to state legislation? By what authority does the state, in the face of such existing national common law, enact and enforce bankrupt and insolvent laws, change the standard of weights and measures, and prescribe the multitude of regulations that relate to commerce, interstate as well as intrastate? If there be existing laws upon these subjects, referable to the nation as their authority, would it not follow that all legislation of the state, within these fields, is inoperative? There cannot be separate systems of law over the same subject-matter and the same territory, emanating from separate sources of authority. If the nation already has a system, and such system is within its field of power, the state cannot invade that field to change or modify it. The state could as effectively repeal or alter an act of congress relating to bankruptcies or commerce between the states as repeal or alter the nation's common law touching these subjects, if there be such; for such common law would, until changed by congress, be the existing mandate of the nation upon those subjects. The proposition contended for would exclude at once the whole conception of concurrent jurisdiction, and leave the state without any power upon any subject concerning which congress was, under the constitution, authorized to legislate. It would break down at one stroke the vast and important legislation of the states, that has universally been recognized and enforced as the law of the land, but that occupies fields within the bare power of congressional legislation. It would require the nation, at once, to enter upon what it has never yet attempted, except as the im-

perative emergency arose, namely, a complete code of laws upon every possible subject within its constitutional powers, where the provisions of the common law had become antiquated or burdensome. If the nation has already prescribed the common law upon subjects within the field of its power, the states are thereby excluded, and the whole doctrine of concurrent jurisdiction is not only without logical basis, but is practically and inherently impossible.

An argument even stronger than these consequences to a settled judicial interpretation of the constitution is found in the letter of the constitution itself. To no one more than to the framers of that instrument was it apparent that two systems of law upon the same subject, from different governmental authorities, could not harmoniously exist. One system or the other must be regarded as supreme. Hence, it was provided (article 6) "that the constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made, under the authority of the United States shall be the supreme law of the land * * * anything in the constitution or laws of any state to the contrary notwithstanding." Observe what is made the supreme law: The constitution, the laws which shall be made in pursuance thereof, and all treaties made, or which shall be made. If, under the constitution, the nation adopted or succeeded to the common law of England, as the law of the land, within the field of national power, why should there have been no mention of such common law as a part of the supreme law of the land? Why should it be exposed, any more than the constitution, or the acts of congress thereafter made, to the attack or modification of the states? Treaties are necessarily made laws of the nation, and, hence, the existing treaties were made inviolate against state intrusion. Why should the then existing laws, introduced into the system as continuing laws, share a different fate? Was it contemplated that the rules of civil conduct prescribed to the citizen by the nation, through the supposed body of the common law, should be rules only so long as the states permitted? If a national common law prevails, it is by virtue of the constitution. Can any reason be assigned why acts of congress were made supreme, while this supposed act of the constitution was left subservient?

The new government, for obvious reasons, was compelled to observe its treaties, but, excepting these, it seems plain to me that the framers of the constitution contemplated a government whose beginnings were there and then, and whose commands to the citizen must be found in the letter of the constitution, or the laws thereafter promulgated. The great bulk of authority was left with the states. Each of these had already existing laws that covered the body of ordinary current affairs. The nation was not devised to give law upon these affairs. It was invested with a field of vast power, but only to be entered as the needs of nationality from time to time gave rise. No national common law was necessary. The subjects upon which common law acted were principally left to the states, and there it already existed. It was apparent that, as rapidly as

the nation was called upon to enter upon its fields of otherwise bare power, congress could supply the laws needed.

But, it is urged, the supreme court has invariably recognized the existence of general law, according to which its administration of justice has proceeded. Thus, for instance, in an action for damages growing out of negligence, within the boundaries of Ohio, the supreme court of the United States held the engineer and fireman of a locomotive, running alone, and without any train attached, to be fellow servants (Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914), while a long line of decisions of the supreme court of the state held they were not. So, too, the supreme court of the United States held that the payee or indorsee of a bill, upon its presentment to the drawee, and his refusal to accept, had the right to immediate recourse against the drawer, notwithstanding a statute of the state forbidding suit to be brought in such a case until maturity of the bill. Watson v. Tarpley, 18 How. 517. It is insisted that these and other cases show the existence of some general law, separate from and independent of the law of the land prescribed by the states. This does not, in my opinion, follow. Indeed, it could not follow without introducing into the jurisprudence of this country the anomaly of the existence of two laws over the same territory, and upon the same subject-matter, enforceable, respectively, according to the accidents of the residence of the parties between whom the differences arise. Suppose, in the Ohio case, that two firemen had been on the engine with the engineer, and both had been injured through his negligence; one of the firemen living in the state of the defendant, and the other living in another state. To each of the injured the locus is identical; the negligence is identical. Is it possible that the accidental difference of residence brings into play a difference of law affecting their rights so radically? Is the obligation of the railroad upon the soil of Ohio, under circumstances identical, different to the Ohioan from what it is to the Kentuckian? The supreme court could not have so held. In the case cited the federal court administered, not the law of the United States, but the law of Ohio. The difference between its holdings and those of the courts of Ohio was not due to a difference of law, but to a different interpretation of the law. In all cases to which the jurisdiction of the federal court is extended, its duty is, not only to ascertain the facts, but to interpret the law applicable thereto, as well. The law is the same law interpreted by the state courts, but the interpretations are not necessarily the same. The decisions of the state court are not necessarily the law, but only mirrors of the law. They may be mistaken interpretations, and therefore incorrect mirrors. The litigant in the federal court is entitled to the law as it is, not simply to the local judicial reflection of the law. What the supreme court in effect said in that case was, not that the law applicable to the case before it was different from the law applicable to any like case arising in Ohio, but, that the decisions of the state courts had not accurately evidenced the law, and were therefore not to be followed.

The same observation applies to the Mississippi case. The general commercial law in force in Mississippi, as well as in other states of the

Union, gave the payee of a bill immediate recourse upon the drawer, upon the refusal of the drawee to accept. The statute of the state, however, forbade suit to be brought until after the maturity of the bill. The question was whether a litigant seeking recovery through the federal courts, before maturity, was barred by this statute. Un-doubtedly, the state had the right to modify the commercial law that should prevail within its boundaries. But the statute in question created no change in substance of the commercial law, but only in the remedy that the parties should enjoy. It was purely remedial, and not substantive, and, so far as it was remedial was not neces-sarily binding upon the federal court. The federal court sat in Mississippi to enforce the commercial law applicable to the given case, and as such was an independent tribunal, to be governed, as to its remedial rules, by the procedure to be found in the common law, the acts of congress, and the policy of the state, so far as such was found just and applicable. Whether the prohibition of this remedial statute should be applied to a suitor in the federal tribunal was to be determined by itself, upon considerations of justice, and did not mandatorily follow the enactment of the local statute.

That the federal courts enforce, not a general law of the United States, but the law of the particular states applicable to the contro-versy, is demonstrated by an illustration arising every day. At com-mon law, neither the heirs nor administrators could recover damages for the death of the decedent, though caused by negligence. There has been no act of congress changing this rule. In most of the states, however, the common law, in this respect, has been modified by per-mitting a recovery in such cases to a given amount. The federal courts are every day made the scene of such suits. Are the judg-ments granted therein in pursuance of any common law of the United States? Manifestly, not; for in the common law, unmodified, there can be found no warrant for such suits. The actions, though in the federal court, are based, as in the state court, upon rules of civil conduct prescribed by the state through its adopted common law, with the modifications thereof prescribed by the state.

I can conceive that it may be said that though, in the illustration given, the federal courts enforce state law, it would not follow that, in actions arising from matters within the field of the nation's powers, the federal court may not find a United States common law to enforce. I am not considering that distinction, but am treating of cases which are urged wholly irrespective of such distinction. Neither the Ohio nor the Mississippi case cited, nor any of those to which my attention has been called in that connection, involved sub-jects within the field of the nation's power. The Ohio case arises from the law of negligence,—a purely police, and therefore local, regulation,—and the Mississippi case does not disclose any element of interstate commerce or other national power. Indeed if the deci-sions cited established the existence of a United States common law or general law over the subject-matters involved, it would follow that the line of demarkation between state and national fields of power had nothing to do with the solution.

But it is urged that the Reports abound with cases in which

the federal courts, in construing ordinances and statutes, and otherwise ascertaining the rights of parties, resort for light to the common law. It could not be otherwise. The common law is the background against which the outlines of our institutions are drawn, and the foundation upon which the transactions of our race are builded. It is as essential to interpretation as light is to the operations of the microscope. But it is not thereby made the law of the land. Mechanics and medicine are likewise essential to interpretation. Only by looking into their fields can courts accurately ascertain the meaning of many transactions or statutes. They are the settings of transactions and statutes, but do not by reason of that become a part of the law of the land. The law of the land is a rule of civil conduct prescribed by the supreme power in the state. An appeal to the common law for light is entirely distinct from a search of the law of the land for the evidence of a command.

But, it is asked, what law prevails in the territories and the District of Columbia? The constitution itself answers. Upon congress is conferred (article 1, § 8) the right "to exercise exclusive legislation" over the District of Columbia, and all places purchased for the erection of forts, arsenals, etc., and (article 4, § 3) to "make all needful rules and regulations respecting the territory of the United States." Over the area covered by the territories and the District of Columbia, therefore, there is but one sovereign. The territorial governments are simply the agencies of the nation, and are, in this respect, different from the states. But, as I have pointed out, there is a law of the land attached to every inch of our soil. It is, in some cases, the common law; in others, the civil law,—dependent chiefly upon the character of the earlier dominion extended over it. Now there being but one sovereign,—the nation,—the common law or the civil law, as the case may be, is necessarily attributable to it, as the only supreme power in the state. Here the nation has succeeded to the earlier sovereignties which prescribed the common or civil law as the law of the land. There is, therefore, a common or civil law of the United States over those areas not yet taken into the boundaries of the states.

But there is no inconsistency between this and the position hereinbefore taken. Each inch of soil necessarily has its law of the land, but, in the areas in which the nation and state are coterritorial, the sovereignty to which all law is attributable, except such as is found in the constitution of the United States and the laws in pursuance thereof, and the treaties, is that of the state. There the common law is not attributable to the United States as sovereign, because neither the constitution, nor laws of the United States in pursuance thereof, have so adopted it. The distinction, though it might theoretically and speculatively be otherwise, is actual, as shown by the intendments of the constitution and the doctrine of concurrent jurisdiction already pointed out, and it is only with actualities that the court can deal.

It is also asked, what law is in force upon the navigable waters of the United States, unless there be a general law of the United States? The answer is again found in the constitution (section 2,

art. 3), which extends the judicial power of the United States to all cases of admiralty and maritime jurisdiction. This is an express bestowal, in the fundamental law of the land, of all maritime power and authority, upon one of the departments of the nation. The bestowal is as broad and as exclusive as the power to declare war. It necessarily carries with it the code of rules applicable to maritime jurisdiction. That code is specifically a national code. It is neither common law nor general law. It is, in the language of Justice Bradley, in The Lottawanna, 21 Wall. 558, "like international laws, or the laws of war which have the effect of law in any country no further than they are accepted and received as such." The clause is simply the bestowal upon the nation of a purely national power, self-enforcing by the employment of such rules as the nation alone may prescribe. But beyond this special jurisdiction, carved out of the general jurisdiction, and, for national purposes, bestowed exclusively upon the national government, the laws of the states within whose territories the navigable waters lie are still in force, subject to the exigencies and necessities of the maritime power. The territory covered by the navigable waters is under the law of the land which the proper state may prescribe. The existence, therefore, of this power in the nation, adds nothing to the proposition that there is a United States common law of the land.

But it is said that, if there is no United States common law applying to the field of interstate commerce, there could have been, until the enactment of the interstate commerce act, no law in that field whatever. And it is inferred from this that common carriers within that field, until the enactment of the interstate commerce act, could not have been liable for refusing to receive goods or passengers, or delaying their arrival, or for other like wrongs or delinquencies. It is never safe to argue the existence of a law from the necessities that ought to give rise to it. The sovereign power does not always meet even the apparent needs. And, if law were always to be inferred where needs were found, I fear a diversity as wide as the personal predilections of the judges would be introduced. But the gaping vacuum upon which the argument is predicated does not in fact exist. The power of the nation over interstate commerce is exclusive only in respect of those features where a uniform rule is imperative,—features that are essentially national affairs. In all other respects, until congress acts, the field of interstate as well as intrastate commerce is occupied by the power and existing laws of the state. Into this latter classification, undoubtedly, would fall the duty of the common carrier to receive all proper goods offered to it for transportation, to make no undue discrimination between shippers of a like class, and to transport with reasonable expedition. There is nothing essentially national in these requirements. They can reasonably be left to the judgment of the local law where the goods are offered. Indeed, the constant and uninterrupted application of such local law to these fields of interstate commerce, through a century, forestalled the need of any national legislation, and constitutes a cogent illustration of the nonexistence

of a common law attributable to the nation as its sovereign and giver; for, how could the many modifications introduced by the state into these common-law duties and liabilities be effective, if there existed also a national common law upon the same subjects, unmodified by congress, and insusceptible of modification by the states?

Having duly considered these criticisms upon and variations from my former holding by some of the judges of the other circuits, I remain of the opinion that there is no national common or general law, in the sense of a rule of civil conduct, prescribed by the nation, as sovereign, which can be made the basis of an action to recover back rates, simply because the court may find them to be unreasonable. So far as the existing law applicable to the subject of rates in interstate commerce was concerned, prior to the interstate commerce act, the shipper and the carrier were at liberty to make such contract as they could agree upon; and such a contract would be left untouched, unless for such reasons as would justify the abrogation of contracts between other parties and upon other subjects. This, of course, does not exempt the carrier from the duty of carrying out the contracts actually made. If, between it and the shipper, a specific rate was fixed, such will control; and if no rate was fixed, the ordinary method employed by the law to supply the missing element of the contract is to be followed. If no rate was fixed, and the shipment was not made in contemplation of any specific rate, the implications of the law are that the parties intended a reasonable rate; and the exaction in such cases of an unreasonable rate can be made the basis of a recovery, not because of the existence of any law which prohibits the exaction of unreasonable rates generally, but because, in the particular case in hand, the exact rate is the omitted element of the contract, and must therefore be supplied by the implications of the law.

The majority of the counts in the declaration under consideration proceed expressly upon the theory that, irrespective of the contract between the parties, the law prohibited the exaction of unreasonable rates, and allowed their recovery back upon a showing of the fact. To these counts, in my opinion, a demurrer ought to be sustained. Several of the counts are evidently drawn upon the theory that no specific rate was at the time agreed upon, or in contemplation, and that in view of this the rate actually exacted, being unreasonable, was contrary to the element of the contract read into it by the implications of the law. So far as these counts relate to shipments prior to the interstate commerce act, they present some difficulties, and especially so, in view of the fact that they compress into single averments the different shipments of months and years, each of which must necessarily have been distinct from the other, and properly subject to distinct contracts or rates in contemplation. So far as these counts relate to shipments after the interstate commerce act, I am clear that, in absence of the averment that no rates were published and in existence as is required by the law, the actions would not lie. By requiring the fixing and publication of these rates, the interstate commerce act supplies at least prima facie evidence of the contract rate, which can only be overcome by

averment in avoidance thereof. One of the counts proceeds upon the theory of unjust discrimination between shippers, but whether it alleges with sufficient preciseness that the discrimination was between shippers who, by reason of contemporaneousness of shipment, route traversed, and character of product shipped, were entitled to like rates, does not clearly appear.

My conclusion, on the whole, is to sustain the motion, and allow the demurrers to be filed, intending to sustain the demurrers to all the counts, except those relating to discrimination, and those relating to shipments prior to the interstate commerce act, which proceed upon the idea that an express contract for rates was not concluded, but was left to the implications of the law. On the counts of this character, I will hear the demurrer, to determine if the allegations of the count are sufficiently specific and single to bring them within the right of recovery.