PETERS v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 13, 1899.)

No. 463.

1. CRIMINAL LAW—OFFENSES COGNIZABLE BY FEDERAL COURTS.

The courts of the United States do not resort to the common law as a source of criminal jurisdiction, but can only take cognizance of such crimes and offenses as are expressly designated by the laws of congress, and of which they are by such laws given jurisdiction.

2. INDICTMENT—SUFFICIENCY—CHARGING OFFENSE IN LANGUAGE OF STATUTE.

Where a statute fully, directly, and expressly, without any uncertainty or ambiguity, sets forth all the elements of an offense, an indictment is sufficient which charges the offense substantially in the language of the statute.

3. SAME—DESCRIPTION OF OFFENSE.

The sufficiency of an indictment is to be tested by ascertaining whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must meet, and whether, in case other proceedings are taken against him for a similar offense, the record shows with accuracy to what extent he may plead a former acquittal or conviction.

4. SAME—REFERENCE TO AVERMENTS OF PREVIOUS COUNT.

An averment in the second or a subsequent count of an indictment, drawn under Rev. St. § 5209, that said defendant, on a date given, "being then and there the cashier of said association as aforesaid," as such cashier, committed the acts charged, is sufficient to identify and incorporate in such count the averments of the first count that the defendant was, at the time referred to, the duly elected and acting cashier of a certain national banking association, and that such association was at the time existing and carrying on business under the laws of the United States.

5. SAME—MANNER OF DESIGNATING YEAR.

The designation in an indictment of the year in which the offense is laid by Arabic figures is sufficient, and no prefix is essential; the year of the Christian era being understood as meant in all public or judicial documents in this country, unless otherwise expressed.

6. NATIONAL BANKS—FALSE ENTRIES BY OFFICERS—SUFFICIENCY OF INDICTMENT.

An indictment against a sole defendant, charging that, as cashier of a national banking association, he caused and procured the making of false entries in the books of the bank, by certain clerks under his control as

such cashier, with intent to defraud, sufficiently charges him with the offense as principal; the making of such entries by his direction being the same, in legal effect, as his making them in person.

7. CRIMINAL LAW—SUFFICIENCY OF INDICTMENT TO SUPPORT SENTENCE.
Where a verdict of guilty is rendered on a number of counts, a sentence which does not exceed that which may legally be imposed on any one count is supported by the indictment, if any count is good.

8. SAME—PLEA OF FORMER ACQUITTAL—MANNER OF DISPOSITION.
Where a so-called "special plea of former acquittal" is made in the form of a motion to discharge the defendant and exonerate his bond, based on former proceedings in the same cause and court, so that no evidence thereon is required, and only a question of law is presented, it is not necessary that issue should be joined thereon, and it may properly be disposed of by the court, like any other motion.

9. SAME—REVIEW—WAIVER OF OBJECTION.
A defendant who, after the overruling of a special plea of former acquittal, proceeds to trial without objection as to the manner in which the plea was disposed of, waives the right to raise the question on appeal.

10. SAME—FORMER ACQUITTAL—CONSTRUCTION OF VERDICT.
In a prosecution against an officer of a national banking association, under Rev. St. § 5209, for making false entries in the books of the association, and in reports to the comptroller, the indictment containing a number of counts, some charging the making of entries with intent to injure and defraud the association, and others with intent to deceive the association, and, in case of reports, the comptroller, the jury, on the first trial, rendered a verdict, which was set aside and a new trial granted, in which they found the defendant "guilty, as charged in the indictment, in falsifying the returns to the comptroller of the currency, and also books of the * * * bank, and on the balance of the counts we do not agree." Held, that such verdict could not be construed as a special verdict, amounting to an acquittal.

11. SAME—TRIAL—PRESENCE OF DEFENDANT—SUFFICIENCY OF RECORD.
It is not essential that the record of a criminal trial should show the presence of the defendant at every step of the proceedings, but the presumption is that his presence, once noted, continues at least during that entire day.

12. SAME—EXAMINATION OF WITNESS—LEADING QUESTIONS.
Permitting the prosecution to propound leading questions to one of its witnesses is within the discretion of the trial court, and cannot be made the basis of an assignment of error.

13. SAME—EVIDENCE.
For the purpose of showing the falsity of an entry in the books of a national bank purporting to show a special deposit by a county treasurer of $10,000 immediately prior to a report made to the comptroller, which was shown to have been withdrawn a few days later, the government introduced the treasurer as a witness, who testified that he did not remember whether or not he made the deposit, but, if he did so, it was from public funds in his hands as such treasurer. Held, that it was within the discretion of the court to permit the introduction of the treasurer's cashbook for the purpose of showing whether or not any entry of such deposit or withdrawal appeared therein, although the witness testified that, if he made the deposit, no record thereof would appear on the books of his office.

14. WITNESSES—RIGHT OF PARTY TO SHOW INCONSISTENCY IN TESTIMONY OF HIS OWN WITNESS.
While a party is not permitted to impeach his own witness, he is not precluded from showing facts inconsistent with some of the statements of the witness.

15. NATIONAL BANKS—FALSE ENTRIES IN BOOKS BY OFFICER—WHAT CONSTITUTE.
In a prosecution of an officer of a national bank for making false entries in its books with intent to deceive the bank examiner, where there

was testimony as to certain deposits made which were marked "special," and that the identical money was a few days later returned to the depositors, an instruction was correct which charged the jury that, if they found beyond a reasonable doubt that the understanding between such depositors and the defendant was that the money was only to be used by the bank for the purpose of being shown to the examiner as a part of the funds of the bank, then the entry of such sums as deposits was a false entry.

16. SAME—INTENT—INFERENCE FROM FACTS PROVED.

A finding as to the intent with which false entries were made in the books of a national bank by an officer of the bank may be based on legitimate inferences from the facts shown, and where, on the trial of a defendant for making such entries with intent to deceive the bank examiner, it is found that the entries were false; that they were made, or caused to be made, by defendant; and that their necessary effect was to deceive the bank examiner,—it may be inferred that they were made with such intent.

17. CRIMINAL LAW—TRIAL—CONSTRUCTION OF INSTRUCTIONS.

In determining whether a charge in a criminal case is misleading, it must be read and considered as an entirety.

In Error to the Circuit Court of the United States for the Western Division of the District of Washington.

W. H. Bogle, W. H. Pritchard, and B. W. Coiner, for plaintiff in error.

Wilson R. Gay, U. S. Atty., and Charles E. Claypool, Asst. U. S. Atty.

Before ROSS and MORROW, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. William G. Peters, the plaintiff in error, was indicted by the United States grand jury of the district of Washington for a violation of the provisions of section 5209, Rev. St., which reads as follows:

"Sec. 5209. Every president, director, cashier, teller, clerk or agent of any association, * * * who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association, * * * or to deceive any officer of the association or any agent appointed to examine the affairs of any such association; * * * shall be imprisoned not less than five years nor more than ten."

The indictment contained 46 counts. Counts 1 to 22, inclusive, have reference to alleged false entries and reports made with intent to injure or defraud the association. The remaining counts came under the other provisions of the statute, as to the acts of defendant having been committed with intent to deceive an agent appointed to examine the affairs of such association, or making false reports and statements of the bank to the comptroller of the currency.

Upon the first trial of the case the jury found a verdict as follows:

"We, the jury impaneled in the above-entitled cause, find the defendant, William G. Peters, guilty as charged in the indictment, in falsifying the returns to the comptroller of currency, and also books of the Columbia National Bank, and on balance of counts we do not agree."

Thereafter, in due time, counsel for Peters moved the court for his discharge upon the following grounds:

"Because the verdict of the jury is insufficient in form, substance, and law to authorize the entry of any judgment against the defendant other than a

judgment of acquittal, and that he be discharged, and do go hence without day."

This motion was overruled, and exception taken. Thereupon a motion was made "for a judgment of acquittal and discharge on said verdict as to counts 1 to 22 of said indictment, both inclusive"; which motion was overruled, and exceptions thereto were allowed.

Peters then made a motion to set aside the verdict of the jury and for a new trial, which was granted. The trial of the cause was continued until the next term; at which time, the cause coming on regularly to be heard—

"The defendant, William G. Peters, moved the court for leave to file his plea of former jeopardy to counts 1 to 22, both inclusive, of the indictment herein, and his plea of former acquittal to counts 23 to 46, both inclusive, of said indictment, which leave was given, and said plea was thereupon filed; and thereupon the district attorney moved the court for leave to enter a nolle prosequi as to counts 2 to 22, both inclusive, of said indictment, which was granted. and a nolle prosequi was thereupon entered, and said defendant discharged as to said counts 2 to 22. And thereupon, upon the statement of the district attorney that he intended to produce no evidence touching the matters alleged in count 1, except evidence to prove the organization of the Columbia National Bank, its location, and the appointment, qualification, and acting of the defendant as its cashier, and to prove venue, the court overruled said pleas as to count 1, and also as to counts 23 to 46, inclusive; to which action of the court in overruling said pleas as to count 1, and counts 23 to 46, inclusive, the defendant excepted, and his exception was allowed."

The case thereafter proceeded to trial on the remaining counts (23 to 46, inclusive) on defendant's plea of not guilty. The jury found a verdict thereon as follows:

"We, the jury impaneled in the above-entitled case, find the defendant, William G. Peters, guilty as charged in counts numbered 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, and 46 of the indictment therein contained."

Motions were thereafter made for a new trial and in arrest of judgment. These motions were overruled, for the reasons given by the circuit court in U. S. v. Peters, 87 Fed. 984.

The rights of a defendant in a criminal case should, at all times, be carefully guarded. But courts must look at the substance, instead of the mere shadow, of the alleged errors. Courts should not be called upon to deal with "trifles light as air." We have carefully read all the testimony contained in the record, and have arrived at the conclusion that the evidence is sufficient to sustain the verdict of the jury. This being true, there must be something legal, tangible, and real affecting the essential rights of the defendant to justify the court in reversing the verdict of the jury. Error in law must be affirmatively shown. If the plaintiff in error has not been deprived of any substantial right; if he has not been misled; if he has not been prejudiced or injured in any respect,—he has no real or substantial cause for complaint simply because the old forms and precedents have not been literally followed. He presents for the consideration of this court 40 specific assignments of error, nearly equal in number to the counts originally contained in the indictment. Twenty-one of these counts were summarily disposed of for want of any proof to

sustain them. It may, in the outset, be said that at least that number of the assignments—some of which, like the counts in the indictment, are repeated, to save any question as to there being a proper statement—may likewise be disposed of. But, notwithstanding this fact, the case is left as full of points as the hide of a porcupine is of quills.

It is our duty to carefully examine all questions worthy of consideration, and it will be our endeavor to group them under as few heads as possible, and at the same time to leave none of the important points unnoticed or undisposed of.

It must be borne in mind that the national courts do not resort to common law as a source of criminal jurisdiction. Crimes and offenses cognizable under the authority of the United States can only be such as are expressly designated by law. It devolves upon congress to define what are crimes, to fix the proper punishment, and to confer jurisdiction for their trial. U. S. v. Walsh, 5 Dill. 60, Fed. Cas. No. 16,636; U. S. v. Martin, 4 Cliff. 156, Fed. Cas. No. 15,728; In re Greene, 52 Fed. 104; Swift v. Railroad Co., 64 Fed. 59; U. S. v. Hudson, 7 Cranch, 32; U. S. v. Coolidge, 1 Wheat. 415; U. S. v. Britton, 108 U. S. 199, 206, 2 Sup. Ct. 531.

Every indictment should charge the crime, which is alleged to have been committed, with precision and certainty, and every ingredient thereof should be accurately and clearly stated; but where the offense is purely statutory, and the words of the statute fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished, it is sufficient to charge the defendant in the indictment with the acts coming fully within the statutory description, in the substantial words of the statute. Ledbetter v. U. S., 170 U. S. 606, 610, 18 Sup. Ct. 774, and authorities there cited; 10 Enc. Pl. & Prac. 483, and authorities there cited.

Few indictments under the national banking law have been so skillfully drawn as to escape the hypercriticism of learned counsel. Many of them might, doubtless, have been made more definite and clear. Our object will be to get at the merits, if any there be, of the numerous objections urged,—to ascertain whether the defendant has been prejudiced by the course pursued by the court; whether any of his legal rights has been invaded or violated; and to brush away the cobwebs of pure technicalities with which the trial of the case, as in all criminal cases, seems to be surrounded.

The true test of the sufficiency of an indictment is not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprised the defendant of what he must be prepared to meet; and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction. U. S. v. Simmons, 96 U. S. 362; U. S. v. Carll, 105 U. S. 612; U. S. v. Hess, 124 U. S. 483, 8 Sup. Ct. 571; Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542; Potter v. U. S., 155 U. S. 438, 15 Sup. Ct. 144; Evans v. U. S., 153 U. S. 584, 587, 588, 14 Sup. Ct. 934, 939; Batch-

elor v. U. S., 156 U. S. 426, 15 Sup. Ct. 446; Cochran v. U. S., 157 U. S. 286, 290, 15 Sup. Ct. 628.

The essentials of an indictment drawn under the provisions of section 5209 are clearly stated in U. S. v. Britton, 107 U. S. 655, 662, 2 Sup. Ct. 512, 518, as follows:

"(1) That the accused was the president or other officer of a national banking association which was carrying on a banking business. (2) That, being such president or other officer, he made in a book, report, or statement of the association, describing it, a false entry, describing it. (3) That such false entry was made with intent to injure or defraud the association, or to deceive any agent, describing him, appointed to examine the affairs of the association."

See, also, Cochran v. U. S., 157 U. S. 286, 293, 15 Sup. Ct. 628.

The indictment under consideration sets forth all of these essentials in proper manner and form.

With these general observations, which are more or less applicable to many, if not all, of the points to be discussed, we will proceed to notice some of the specific grounds urged by counsel on behalf of the plaintiff in error.

1. It is claimed that the counts in the indictment, especially 23 to 46, inclusive, upon which the plaintiff in error was convicted, are radically defective, in this: That it is not in either of said counts alleged that the association, whose books and reports are alleged to have been falsified, was organized under the national banking laws of the United States, nor that it was an existing banking corporation, or carrying on the banking business, under the laws of the United States, at the time the acts of Peters are alleged to have been committed.

The first count in the indictment, in so far as it relates to the points referred to by counsel, reads as follows:

"That William G. Peters, on the second day of July, in the year of our Lord one thousand eight hundred and ninety-five, and continuously thereafter, until the twenty-fourth day of October, in said year, at the county of Pierce, in the district of Washington, was the duly elected, qualified, and acting cashier of the Columbia National Bank of Tacoma, a national banking association organized, and then and there existing, under the laws of the United States, and then and there engaged in carrying on a general banking business in the city of Tacoma, in said district, and the said William G. Peters did then and there, by virtue of his said office and employment as such cashier of said association," etc.

The counts from 23 to 46 are substantially, though not precisely, alike. We copy one of these counts in order to show more clearly the objections urged thereto:

"And the grand jury as aforesaid, on their oath aforesaid, do further present that said William G. Peters, on the 11th day of July, 1895, being then and there the cashier of said association, as aforesaid, did then and there, as said cashier, willfully and feloniously make in a certain book, then and there belonging to and in use by the said association, in transacting its said banking business," etc.

Counsel admit that a sufficient reference is made by the words "as aforesaid" to identify Peters as the duly-elected cashier, and that the term "said association" identifies the Columbia National Bank of Tacoma, but argues that they are not sufficient to identify the other portions of the first count as to the organization and ex-

istence of the bank, under the laws of the United States.    We are of opinion that the references made in the subsequent counts are sufficient in law.    The language used therein could not, under any reasonable construction, be held to refer to but one William G. Peters, and to but one association, the Columbia National Bank of Tacoma, and necessarily includes the entire description of the officer and of the association as set forth in the first count.

In Blitz v. U. S., 153 U. S. 308, 316, 14 Sup. Ct. 924, 925, the indictment was drawn under section 5511 of the election law, and contained three counts.    In the first count it was alleged:

"That on the 8th day of November, A. D. 1892, at Kansas City, in the county of Jackson and state of Missouri, there was then and there an election, duly and in due form of law had and held, for choice of representative in the congress of the United States, * * * and that at the said election one Morris Blitz did then and there unlawfully, falsely, knowingly, and feloniously personate and vote, and attempt to vote, in the name of another person, other than his own name," etc.

The latter portion of the first count was held defective, in that it failed to state that the defendant voted for a representative in congress.    In the course of the opinion, in reviewing other counts, the court said:

"In respect to the third count of the indictment, but little need be said.    It is clearly sufficient, for it charges that 'at said election' the defendant voted more than once for representative in congress.    Such double voting is made an offense by the statute.    The only question that could arise upon the third count is whether the words of the first count, referring to the election had and held on the 8th day of November, 1892, for representative in congress, can be drawn through the second count, into the third count, by the words, 'at the said election.'    As the election named in the first count is the only one specifically described in the indictment, there can be no doubt that the words, 'at said election,' in the third count, refer to the election described in the first count."

The present indictment, tested by this decision, is clearly sufficient.

2. It is claimed that the counts from 23 to 46 are defective in their averments as to the time when the acts are alleged to have been committed.    They vary as to the day and month.    The one heretofore quoted alleges "that said William G. Peters, on the 11th day of July, 1895," etc.    The contention is that there are no words to indicate that by the figures "1895" is meant "the year of our Lord one thousand eight hundred and ninety-five."    The ancient rule as to the necessity of designating the era rested upon the fact that two periods were then in vogue in computing time, viz. the reign of the king and the Christian era, and unless the one or the other were designated the time would be uncertain.    This rule was therefore upheld with great strictness, and a failure to observe it was held to be fatal. But in the United States no such reason exists, and the rule (although it was adopted and followed by some of the earlier decisions in this country) should not be applied, unless made a requirement by statute.    "Cessante ratione legis, cessat ipsa lex."    When a year is stated it is not, therefore, necessary to the validity of the indictment that the era, as "in the year of our Lord," or the term "anno Domini," or "A. D.," should be added thereto, because the Christian era will be understood from the mere statement of the year in Arabic figures.

Com. v. Doran, 14 Gray, 37, 38; Engleman v. State, 2 Ind. 91, 93; State v. Gilbert, 13 Vt. 647, 651; Smith v. State, 58 Miss. 867, 871; Hall v. State, 3 Ga. 18, 22.

In Engleman v. State the court said:

"It is a fact, historically known, that Christian nations have generally adopted the Gregorian calendar, numbering the years from the birth of Christ. This is a Christian state, and has adopted the same; and when a year is mentioned in our legislative or judicial proceedings, and no mention is made of the Jewish, Mahometan, or other system of reckoning time, all understand the Christian calendar to be used. For example, the constitution of the United States declares that the importation of certain persons shall not be prohibited before the year eighteen hundred and eight, and that of Indiana declares that Corydon shall be the seat of government till eighteen hundred and twenty-five. These are important documents, demanding the greatest certainty and precision of statement, yet whoever heard of any person contending that the year of the union was meant in one of these instances, and the year of the state in the other? To hold an indictment bad for the omission of the words in question can never be necessary to the safety of any of the rights of the accused, and would tend to bring odium on judicial proceedings."

3. The objections urged that certain counts are defective, because they do not charge Peters as a principal, are without merit, in fact or in law. The indictment is drawn against William G. Peters, and no one else. He is the principal; the only person accused of committing the crime. It was drawn so as to cover almost every conceivable state of facts that might be elicited at the trial. Several of the counts allege that Peters in person made the entries which are alleged to be false; others charge that he willfully and feloniously caused and procured the entries to be made by one A. L. Andrus, who was a clerk of the banking association; another, that he willfully and feloniously caused, directed, and procured the entries to be made by one D. A. Young, who was a clerk and bookkeeper of said association, under the control of Peters as cashier. It necessarily follows that the contention of counsel that these counts do not state facts which, if true, make the said Peters guilty as principal, is, as before stated, wholly without merit. He is as guilty if he directed false entries to be made by the clerk or bookkeeper as if he made the entry in person.

In Cochran v. U. S., supra, relied upon by the plaintiff in error, the indictment was against the president and cashier of the bank, and the language of the opinion had reference to that particular state of the facts.

In Agnew v. U. S., 165 U. S. 36, 52, 17 Sup. Ct. 235, 241, the true rule upon this subject is clearly stated in an instruction, which was approved by the court, and reads as follows:

"The crime of making false entries by an officer of a national bank, with the intent to defraud, defined in the Revised Statutes of the United States (section 5209), includes any entry on the books of the bank which is intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or to defraud the association. The crime may be committed personally or by direction. Therefore the entry on a slip upon the books of the bank, if the matter contained in that deposit slip is not true, is a false entry. If the statement made upon the deposit slip is false, the entry of it in the bank, and the books of the bank, is false."

As the verdict of guilty was rendered upon all the counts, and the sentence did not exceed that which might properly have been imposed

upon conviction under any single count, such sentence is good if any such count is found to be sufficient. Claassen v. U. S., 142 U. S. 140, 12 Sup. Ct. 169; Evans v. U. S., 153 U. S. 584, 595, 609, 14 Sup. Ct. 934, 939. The other objections to the indictment need not, in the light of what has already been said, be discussed.

4. It is argued that the court erred in overruling the special plea of the defendant, because no issue in law was joined as to said plea. We have heretofore copied the proceedings in full in relation to this so-called "special plea." By reference thereto, it will be observed that the plea is not, in form or substance, like the ordinary plea "of a former acquittal." It is simply a motion to discharge the defendant from custody, and exonerate his bond. As was said by the learned circuit judge: "It referred solely to proceedings which had been had in the court in which the cause was pending, and concerning which the court needed no evidence, and could take none. The only question presented by the plea was a question of law." It was not a question of fact, to be disposed of by a jury. This, of itself, seems to us to be sufficient to sustain the action of the court in denying the motion or plea. But the case need not rest on that alone. It is true that the record shows that "no demurrer nor traverse to said special pleas was filed by the government." In the light of the facts in regard to the proceedings, it was not necessary. But the record also shows that "the sufficiency of said plea was passed upon by the court on the objection of the district attorney to its sufficiency, made in open court, and the defendant's counsel made no objection to its consideration by the court." And thereafter, "without any further action taken, or any other disposition of the special pleas hereinbefore mentioned, and without objection from the defendant or his counsel on that ground, a jury was duly impaneled and sworn to try said cause on the issues raised and joined by the defendant's plea of not guilty." These quotations from the record clearly show that the plaintiff in error waived his right, if any he ever had, to have his so-called "special pleas" otherwise disposed of before proceeding to a trial upon the merits. In view of the facts set forth in the record, it cannot truthfully be said that he has been deprived of the legal right to have his plea disposed of according to established legal rules.

The case of Com. v. Merrill, 8 Allen, 545, is not in opposition to the conclusion we have reached upon this question. There the defendant pleaded a former conviction to two indictments. When the case was called for trial, the defendant objected that the district attorney had filed no replication or demurrer to the plea, and that there was no issue to be tried. The court, in the course of the opinion, said:

"This defendant was called to trial before the jury on the indictments and his two pleas thereto, and was required, against his objection, to give evidence in support of his special plea, though there was no issue thereon; and the judge, on hearing that evidence, ruled that it did not support the plea, and thereupon ordered that the trial proceed upon the plea of not guilty. The judge treated the special plea as if it were before him on demurrer and joinder. * * * The defendant had a right to a trial of his special pleas according to legal rules, and, as he did not waive that right, a majority of the court are of opinion that he has suffered a legal injury by being deprived of such trial."

Here, the plea was made in the form of a motion. The defendant made no objections to the course pursued by the court, and waived his right, if any he had, by consenting to go to trial upon his plea of not guilty. The assignments of error upon this point are not well taken.

5. In connection with the point last discussed, it is claimed that the verdict of the jury on the first trial amounted to an acquittal, and that the court erred in refusing to discharge the defendant. The language of the verdict cannot be legally construed so as to sustain the position contended for by the plaintiff in error, that it is only a special verdict, and does not affirmatively show that the defendant made the entries in the returns to the comptroller of the currency, and in the books of the bank, with the intent to deceive the bank examiner or comptroller. It is a contortion of the language, unjustifiable by any known rule of interpretation, to assert, as counsel does, that the only effect of the verdict is as if it read: "We find the defendant guilty as charged in the indictment to this extent: that he falsified the returns to the comptroller, and also the books of the bank." No such limitation can be injected into the verdict. The verdict was general, not special. The jury found "the defendant, William G. Peters, guilty as charged in the indictment, in falsifying the returns to the comptroller of the currency, and also books of the Columbia National Bank." The indictment, in the counts from 23 to 46, inclusive, consisted of four distinct charges: (1) That defendant made a certain entry in the books of the bank or reports to the comptroller; (2) that the entry so made by the defendant was false; (3) that defendant knew it was false when he made it; (4) that such entry was made by defendant with intent to deceive the bank, or (in the case of the reports) with intent to deceive the comptroller of the currency. As to these counts, the jury found the defendant guilty as charged in the indictment. The other counts (from 1 to 22, inclusive) charged the acts to have been committed by the defendant "with intent to injure and defraud the association," and upon these counts the jury did not agree. These counts before the second trial were dismissed. It is apparent, from this plain statement of the facts, that the court did not err in refusing to discharge the defendant upon the counts from No. 23 to 46, inclusive. Further comment is unnecessary. But it is deemed proper to say that the recent case of Selvester v. U. S., 170 U. S. 262, 18 Sup. Ct. 580, might be examined with profit. In that case the plaintiff in error was indicted for alleged violation of Rev. St. § 5457. The indictment contained four counts. The first charged the unlawful possession of two counterfeit half dollars; the second, the illegal passing and uttering of the same; the third, the unlawful passing and uttering of three pieces of like nature; and the fourth, the counterfeiting of five like coins. The record shows that, after the jury had retired, they returned into court, and stated that, while they were agreed as to the first three counts, they could not do so as to the fourth, and the court was asked if a verdict to that effect could be lawfully rendered. They were instructed that it could be, and thereafter returned a verdict as follows: "We, the jury, find James Selvester, the prisoner at the bar, guilty on the first, second, and third counts of the indictment, and

disagree on the fourth count of the indictment,"—which verdict was received and the jury discharged. All the justices agreed that the failure of the jury to return a verdict on the fourth count did not affect the validity of the verdict rendered on the other counts, or the liability of the defendant to be sentenced on that verdict. The majority of the court, after reviewing many authorities, were of the opinion that where the jury rendered a verdict of guilty on some of the counts, and the verdict was silent as to the other count, the discharge of the jury would amount to a second jeopardy as to the charge with reference to which the jury had been silent. They added: "But such, obviously, is not the case where a jury have not been silent as to a particular count, but where, on the contrary, a disagreement is formally entered on the record. The effect of such entry justifies the discharge of the jury, and therefore a subsequent prosecution for the offense as to which the jury has disagreed, and on account of which it has been regularly discharged, would not constitute second jeopardy." A minority of the court were of opinion that, the defendant having been sentenced under the counts upon which he was found guilty, the effect of such conviction and sentence disposed of the whole indictment, and operated as an acquittal upon the count on which the jury failed to agree. The court did not err in overruling the motion of the plaintiff in error in arrest of judgment.

6. We are now brought to a consideration of the alleged errors occurring during the second trial. It is claimed that the record does not affirmatively show that the defendant was present at "every step of the trial." We will again look at the record, and ascertain the facts upon which this claim is made. The record made on the 9th day of November, 1897, reads as follows:

"Now, on this day, this cause came regularly on to be heard; Wilson R. Gay, Esq., United States attorney, and Charles E. Claypool, Esq., assistant United States attorney, appearing for the prosecution, and D. W. Coiner and W. H. Bogle, Esqs., appearing for the defendant. * * * Counsel for each side having announced their readiness for trial on the remaining counts of said indictment, a jury was called, and the following named persons were examined and duly sworn to try the case: * * * Thereupon the trial duly proceeded until the hour of adjournment, when, by consent, the jury was admonished by the court, and allowed to separate until the incoming court to-morrow morning."

The record made on the 12th day of November, 1897, after stating the presence of the judge, reads as follows:

"Now, on this day, this cause came on for further trial. The jury having been called, the trial duly proceeded to the conclusion; whereupon, after argument of counsel, the jury was duly charged by the court, and retired for deliberation upon its verdict; and thereupon, after due deliberation, the jury returns into open court, and, having been called, in the presence of the defendant, present to the court a verdict, in the words and figures following."

These are the only entries in the record referred to by counsel. It is claimed that the record of the proceedings on November 9th does not show, except by inference, that the plaintiff in error (defendant in the court below) was present when the jury was examined, and sworn to try the case, and that the record on November 12th fails to show his presence while the testimony was being introduced, or at the time when the instructions were given to

the jury. No principle of law, relating to criminal procedure, is better settled than that, in felony cases, nothing should be done in the absence of the prisoner. It is his unquestioned right "to be confronted with his accusers and witnesses." He has the legal right to be present when the jury are hearing his case, and at all times during the proceeding of the trial, when anything is done which in any manner affects his right; and, as a general rule, it is undoubtedly true that, when his personal presence is necessary to protect his rights, the record ought to show the fact of his presence. Lewis v. U. S., 146 U. S. 370, 372, 13 Sup. Ct. 136, and authorities there cited. It is the duty of clerks to see that the record speaks the truth concerning this fact as well as others occurring during the trial. A strict observance of these rules by the ministerial officers charged with this duty would certainly ·tend to relieve the courts of much trouble and annoyance. But what must the record show? What entry must be made? In general terms, it may be stated that the minutes of the court should affirmatively show everything which is essential to the validity of a criminal trial. The record of each day should show the presence of the court and its officers, of the respective attorneys, of the defendant, and of the jury, and then state the proceedings in the order of their occurrence. We must not be understood as intimating that, if the proceedings are not entered in this precise form, the record would be defective, but simply as suggesting a proper form of keeping the minutes. Every case must, of course, stand or fall by its own particular facts, as shown by the record. When the record does affirmatively show that the defendant was present, it is unnecessary to repeat that fact "at every step" which is taken during the day. It would be absurd to require that every ·time a witness is sworn, a motion made, a ruling announced, an ·exception noted, an instruction given, leave of the court for a juror ·to retire in charge of an officer for a few minutes, or any other step taken, an entry in the journal must affirmatively show that "the defendant was then and there personally present." The law never requires, even in a criminal trial, vain and useless things to be done. Our attention has not been called to any case which holds that a record which omits noticing the presence of the defendant "at every step" taken during· the day when his presence, as in the present case, was once regularly entered in the minutes, is insufficient. All the cases which discuss this question hold that the fact of the defendant's presence need not be repeated at ·each recorded step. Jeffries v. Com., 12 Allen, 145, 154; Grimm v. People, 14 Mich. 301, 308; State v. Wood, 17 Iowa, 19, 21; Folden v. State, 13 Neb. 328, 332, 14 N. W. 412; State v. Lewis, 69 Mo. 92, ·96; Territory v. Yarberry, 2 N. M. 391, 457; Irvin v. State, 19 Fla. ·872, 891; Lawrence v. Com., 30 Grat. 845, 851; Cluverius v. Com., ·81 Va. 787, 848; Stephens v. People, 19 N. Y. 549, 552; State v. ·Craton, 28 N. C. 165, 168; Schirmer v. People, 33 Ill. 276, 284.

As was said in Palmquist v. State (Fla.) 11 South. 521:

"It is not indispensable that the record should show, by a direct affirmative recital, the personal presence of the accused at each and every step taken in

the trial, although such presence is necessary. This fact will sufficiently appear if the record affirmatively shows either expressly or by reasonable intendment, or in substance, that he was present in person during the trial."

In State v. Lewis, the court said:

"It is also alleged that the record does not show affirmatively that the defendant was present when the verdict was rendered. It does show that he was present at the opening of the court, on the day the verdict was rendered. It never was decided by this court that the record must affirmatively show that the defendant is present at every hour of the day, or at every step of the proceeding on that day. It is sufficient that he was present when the court met, and his absence will not be presumed."

We therefore decline to indulge in the presumption that the defendant was allowed to depart after his presence was noted, and that he remained absent during the balance of the day, or that he was only present when the court was opened, or when the jury retired, or when the jury returned with a verdict, as the case may be. It is just as necessary to show that the jury and the judge were present during the trial as it is to show that the defendant was present, but their presence need not be repeated "at every step" of the proceedings. The presumption, if any is to be indulged in, would be that a presence, once noted, continues at least during the entire day. Without further elaboration, our conclusion is that the point urged by counsel is without any foundation in the facts, as shown by the record; that it cannot be sustained upon any substantial reason; and is not supported by authority.

7. It is contended that the court erred in permitting the government to ask and prove by its witness A. D. Andrus that he had testified at the first trial that certain entries alleged to be false, in the books of the bank, were in the handwriting of the defendant. The witness Andrus was the teller of the bank. He testified, generally, that he was familiar with the handwriting of Mr. Peters. When questioned as to who made the figures "20," which appeared in the bank's books, whereby a certain entry was changed, opposite the words, "Gold in vault," from "200," which was in the handwriting of the witness, to "20,200," he said: "I am not certain whose figures they are. * * * I would not like to state positively about it. * * * I should say they look very much like his [Peters'] figures." The figures in the record opposite, "Silver in tray," which were in the witness' handwriting, were "2,838.05," and were changed by placing a figure "2" in front thereof, so as to read "22,838.05." When asked as to whose handwriting this first figure "2" was, he said: "I do not know. I think it resembles his [Peters'] writing. I suppose any one could make a figure '2' good deal like that." Another entry in the book, which was made by the witness, of "2,775.02," was changed by making a figure "3" in front, so that it would read "32,775.02." When asked in whose handwriting the figure "3" was, he said: "I am not certain whose that is." And as to whether it resembled Mr. Peters' figures, he said: "I think it resembles it somewhat." In reply to similar questions concerning the figures that had been changed in the books, the witness said: "I think it looks very much like Mr. Peters' figures. * * * I think it is in the same handwriting

that the rest of those other figures were that I testified to here. Resembles those." "Q. And that is whose? A. Resembles Mr. Peters' handwriting." The witness was then asked if he did not, at a former trial, with reference to these same entries and changes, "testify positively that those figures were in Mr. Peters' handwriting." The witness answered: "I remember testifying that some figures in this book were in his handwriting, but I don't remember whether it was this figure or not." Then certain entries were pointed out to him, and his testimony at the former trial was read, where he had positively testified that the added figures were in Mr. Peters' handwriting. The witness in reply said: "Why, I think that is my testimony, if it was all taken down correctly." We have made this somewhat extended reference to the answers given by the witness for the purpose of showing that the question as to his testimony at the former trial was not asked for the purpose of impeaching the witness, as claimed. It did not tend to impeach him, for he did not at the present trial at any time state that the changes were not made in the handwriting of Mr. Peters. It was not allowed for the purpose of refreshing the memory of the witness. True, this was attempted to be done, but the court promptly and properly said to counsel: "You cannot refresh his memory of the handwriting by what he testified to at the former trial. You must test his knowledge of the handwriting at the present time." Again, the court said: "He can refresh his memory of that handwriting by examining the figures, or examining Mr. Peters' known or admitted writing or figures." And the examination of the witness then proceeded upon the lines suggested by the court. The case does not, therefore, fall within the rules announced in Putnam v. U. S., 162 U. S. 687, 694, 16 Sup. Ct. 923, which relate solely to the fact that the former testimony would be inadmissible for the purpose of refreshing the memory of the witness. The questions asked the witness were leading. But, as was said in St. Clair v. U. S., 154 U. S. 134, 150, 14 Sup. Ct. 1002, 1008: "In such matters, much must be left to the sound discretion of the trial judge, who sees the witness, and can therefore determine, in the interest of truth and justice, whether the circumstances justify leading questions to be propounded to a witness by the party producing him." 8 Enc. Pl. & Prac. 86, and authorities there cited.

8. The next contention on behalf of the plaintiff in error is that the court erred in admitting in evidence the cashbook of John B. Hedges, county treasurer of Pierce county. Like contentions are also made as to the admission of the books of J. W. McCauley, city treasurer, and of the books of the German-American Bank. These alleged errors will therefore be considered together, selecting the one relating to the entry, "J. B. Hedges, special," as being the most favorable to the plaintiff in error, for principal discussion.

The entries which are alleged in the indictment in counts from 23 to 46, inclusive, to be false, and the reports of the same as made to the comptroller of the currency, which are likewise alleged to be false, concern three principal transactions: (1) That a pre-

tended deposit was entered as having been made by the German-American Safe-Deposit & Savings Bank with the Columbia National Bank, in the sum of $20,000, on July 10, 1895; (2) the other two transactions relate to the alleged deposits of $10,000 each in the name of "J. B. Hedges, special," and in the name of "J. W. McCauley, special"; and it was contended at the trial by the government that no such deposits were in fact ever made.

In one of the counts of the indictment it was charged that, in order to make a favorable showing of the condition of the bank on the 28th of September, 1895, in response to a call of the comptroller of the currency, false entries were made, as of the 25th, to show that upon that date J. B. Hedges deposited $10,000 "special," which was drawn out by him on the 30th of September, 1895, and that on the 26th day of September, 1895, J. W. McCauley deposited $10,000 "special," which was drawn out by him on the 30th day of September, 1895. And under various other counts the defendant was charged with alterations of the books to make it appear that $20,000 was, by such deposits, added to the sum total of the cash on hand in the bank. J. B. Hedges, with reference to these matters, was called as a witness on the part of the government, and, among other things, testified as follows:

"I was living in Tacoma on September 25, 1895. I knew of the existence of the Columbia National Bank. I don't remember whether on the 25th day of September, 1895, I made a deposit in the Columbia National Bank, 'J. B. Hedges, special,' $10,000, or not. I had no such amount of my own personal money on deposit. I have made a number of deposits such as 'J. B. Hedges, special,' but I don't know whether I made a deposit on that date or not. I don't remember how it would be marked. I did have money entered to the account of 'J. B. Hedges, special.' I do not remember the dates nor the time. * * * In making deposits of that kind, I would receive a deposit slip, which I would take away with me, and hold it until I got ready for the money, and go and get the money, and then I would give the deposit slip to the officers of the bank, and they would give me the money. * * * I always returned the slip and took the money. * * * When I took $10,000, if I ever did, to any bank, during the fall of 1895, it was public funds,—state, county, and different funds going to make up that amount. When I took an amount like that from the public repositories, I would go and put it in my own name, 'special.' I kept no record at all of it in my office. No record was necessary. * * * If the records of the bank would show that there never had been, or pretended to be, more than one deposit in my name marked, 'J. B. Hedges, special,' that would not refresh my memory, or aid me to say that I never had made any, or, if at all, more than one; it would have no weight with me."

After giving this testimony, his cashbook as county treasurer was produced; and after he had testified that he believed the book to be correct, and that he had had general supervision of it and checked it up, and had therein kept the transactions of his office, he was allowed, over the objection of the plaintiff in error, to testify as to the entries of his books on September 24th to September 30th, inclusive, and from this evidence it did not appear that any sum of $10,000 had been entered upon his books, either as deposited in the bank, or as drawn from the cash on hand, or as restored to the cash on hand. After some testimony concerning said entries, the witness adhered to his former testimony in regard to having made a deposit about that time, and again stated that, if such deposit was made, his testimony

concerning the same would not in any way be affected by the fact that no entries thereof had been made in his book.

The testimony of Mr. Hedges, county treasurer, and of Mr. McCauley, city treasurer, which is in many respects similar in its general character, exhibits upon its face, to use a mild term, a most remarkable and extraordinary transaction on the part of these officials, intrusted, as they were, with public funds. Neither of these witnesses testified positively about taking the sum of $10,000 to the Columbia National Bank, or to Mr. Peters, the cashier, and receiving a deposit slip therefor at the date mentioned. They say they do not remember; might have done so. Both were unwilling to swear positively either that they did or did not make such a deposit at the time mentioned. McCauley testified:

"To save my life, I couldn't tell you whether I made a deposit of $10,000 or not. I would not say that I did not. * * * I made deposits, and took a deposit slip made out by the cashier and delivered to me. * * * I have a faint recollection that I did make one or more deposits in the Columbia National Bank, and received a deposit slip on which the word 'special' was written, but I would not testify positively. * * * I have had a good deal of trouble in the last two years, * * * and my memory has been somewhat weakened."

From such statements it is apparent that the United States attorney was surprised at the general trend of the testimony of his own witnesses, and sought, in various ways, to bring out all the facts regarding this matter. The books were not offered as substantive evidence against the plaintiff in error, but were introduced and allowed for the purpose of showing what the witness did or did not do with reference to this money; what accounts thereof he kept, or what entries he made, if any. Courts are vested with much discretion in the admission of testimony, under such circumstances. The books were admissible in order to inform the jury as to all the facts, so that they might judge, from all the circumstances and surroundings, of the probabilities or improbabilities, and reasonableness or unreasonableness, of the statements made by the witness that he might have made such a "special deposit," although he could not positively swear that he did. The government had the right to have the witness explain all the facts, so that the jury could, from the whole story, ascertain the truth. The object, end, and aim of all jury trials is to ascertain the truth; and, if the jury has the right (which is unquestioned) to take into consideration the witness' manner on the witness stand,—his hesitation and refusal to make any positive statement, for want of recollection,—we see no substantial reason why they might not consider that the books kept under his supervision, and of which he testified he believed to be correct, might not also be considered, in order to enable them to determine the truth. Was it reasonable to believe, from all the testimony, that Hedges did make a special deposit of, and took a deposit slip for, $10,000 on the date mentioned, without making any note thereof on his own books, which would naturally be supposed to speak the truth, and show where the money of the county could be found, if it had been taken away and deposited in a bank or elsewhere? Of course, the witness had the right to explain why no entry was made upon his books; and the jury had

the right to consider whether the explanation, as given by him, was or was not reasonable and satisfactory. The rule against impeaching one's own witness has never been extended so as to preclude counsel from eliciting all the facts from the witness, even though some of the facts thus drawn out might appear to be inconsistent with some other portions of his testimony. There is a clear distinction as to the principles of law which prohibit a party from impeaching his own witness and the right of a party to show an inconsistency in some portions of his testimony. In Hickory v. U. S., 151 U. S. 303, 309, 14 Sup. Ct. 334, 336, the court said: "The party so surprised may also show the facts to be otherwise than as stated, although this incidentally tends to discredit the witness." See, also, 1 Greenl. Ev. §§ 443, 444; 1 Thomp. Trials, § 515; 29 Am. & Eng. Enc. Law, 812, and authorities there cited.

9. Finally, it is claimed that the court erred in the instructions given to the jury. On this point numerous objections are urged and argued at great length by counsel. It would serve no useful purpose to notice these points seriatim or to discuss the same in extenso. As before stated, the contention of the government, from the beginning to the end of the trial, was that the amounts represented by the entries alleged to be false had never been deposited in the bank. The weight of the evidence sustains this contention. The teller, bookkeeper, clerks, and other employès of the bank, whose special duties required them, either to handle the money or make an entry thereof in the books, testified it was not there. They did not see it. The accustomed places where the ordinary deposits were kept did not show any such amounts at the time indicated by the entries in the books of the bank which are alleged to be false. The plaintiff in error, however, testified that it was there, and he had the right to have instructions given covering that theory of the case.

Peters, after denying that he personally made any of the entries in the book which are alleged to be false, testified as follows:

"I have no recollection of this deposit of twenty thousand dollars that appears to have been made by the German-American Bank in the Columbia National Bank on July 10, 1895. I have not now the least recollection about that transaction. * * * When I made the reports, I believed them to be true, and I still believe it. I did not direct any of those entries to be made by any one, with reference to this twenty thousand dollars deposit by the German-American Bank."

Referring to the account of "J. B. Hedges, special," under date of September 25, 1895, he said:

"That deposit of $10,000 was actually made by Mr. Hedges. He made it on the date it is shown there,—the 25th. I recollect the circumstances under which that deposit was made. I remember that about that time, or a few days before, * * * I went up to Mr. Hedges' office, and had a talk with him about the general affairs of the bank, and we had considerable of a conversation regarding the business of the bank, particularly with reference to getting additional money for the bank. * * * At that time I suggested that if it was convenient for him that I would like to have him make an additional deposit, anywhere in the neighborhood of ten thousand dollars. He afterwards made this deposit. It was late in the afternoon. He made it in gold coin. I gave him a deposit slip as evidence that the deposit had been made. * * * When he brought it down to the bank, he told me that he might want it in a few days again, and he did not want us to use it unless it

became necessary for us to do so. I told him that I did not think that we would require it, and that I would not use it unless it did become necessary. * * * I put it in the safe of the bank. I don't think I could remember whereabouts in the safe. * * * I afterwards paid that money out to Mr. Hedges, somewhere about a week afterwards,—I think the end of the month."

With reference to the account of "J. W. McCauley, special," he said:

"I did not make any of the entries of that transaction. I know that Mr. McCauley made the deposit represented by that entry. He made it with me. Refreshing my recollection from the book, I would say that he made it on the 26th of September. I had a similar talk with him as that I had with Mr. Hedges with reference to the bank, and what we were doing, and it was in response to that conversation that he subsequently made the deposit. I gave him the slip to evidence the deposit, the same as I had given Mr. Hedges. He made the deposit in gold coin. I suppose he brought it in a gold-coin sack. * * * I suppose it was about the same as stated on the book, 'J. W. McCauley, special.' When it was fresh in my memory, I did cause entries of those accounts to be made. I put the money that I got from Mr. McCauley in the safe. I don't have any particular recollection as to whereabouts in the safe I put it. I presume it was in the same form as when I received it. I afterwards paid it to him again. * * * I returned to both of these gentlemen, Hedges and McCauley, the same sacks and the same money. * * * I did not use any of these moneys in the business of the bank. I didn't make any of the entries upon the books with reference to either of these transactions. I instructed Mr. Young to make the slips and enter them upon the books. I do not remember the date. I think it was a day or two after we received it. * * * I didn't give him this direction until 2 or 3 days later. I can't tell you why I did not make it out that night; I just didn't. I didn't think to make it out at that time. I put the money in the safe. I didn't hide it. It was not necessary to hide it. I could not tell you what amount of money the bank had on hand before I got that twenty thousand dollars. * * * I mean to say, that with that bank in that condition I might have in the safe twenty thousand dollars or ten thousand dollars from the night of the 25th, and ten thousand dollars from the night of the 26th, and not think to tell the bookkeepers, and not enter it in my books, until two or three days afterwards, and then have the book entries made. Those entries were not made for the purpose of having the bank show a larger amount of money than it had, nor for the purpose of making these reports to the comptroller of the currency. I probably showed the twenty thousand dollars that was in the safe to McCauley and Hedges. I did not show it to any one else."

The charge of the court with reference to these transactions is substantially the same. We copy but one, which is as follows:

"Concerning the Hedges transaction, there is testimony to the effect that that particular sum of ten thousand dollars was left with the bank by J. B. Hedges, for which he received a deposit slip in his name, marked 'special,' but with the understanding between him and the defendant that, if the bank should need to use the money, it might do so. You are to determine from the evidence what was the nature of the use that was so permitted to be made; and if the evidence convinces you, beyond a reasonable doubt, that the use so permitted, and as understood by the defendant, was to make a showing of said money, if necessary, to any bank examiner or officer of the government, as if the same were money belonging to the funds of the bank, then you are instructed that the entry of said money upon the books of the bank, as appears in the evidence in this case, was a false entry; but if you find that the use so permitted was that the money was to be considered a loan to the bank, or that it might be considered a loan to the bank, or that it should be mingled with the funds of the bank, as an ordinary deposit, subject to withdrawal by check, in the ordinary course of business, the entry of such item on the books would be lawful and proper."

The jury could not have been misled, as counsel claim, by the use of the words, "a loan to the bank," to be "mingled with its funds," as an "ordinary deposit." These words were used to illustrate the point that, if the money was left with the bank to be used by it in its legitimate banking business, "the entry of such item on the books would be lawful and proper." This portion of the charge was certainly as favorable to the plaintiff in error as the law or the evidence would warrant. It was the character of the transaction, not the name given to it, that determined its true nature; and the jury were to decide, from all the facts, whether the acts of the cashier, in making, or causing to be made, the entries in the books of the bank, in relation thereto, were "honest" or "criminal."

It is argued by counsel that the court erred in giving certain instructions, one inconsistent with the other, in relation to the question of intent. It is true that this question was referred to in different portions of the charge. The court seems to have taken extra pains to inform the jury as to the law upon that subject; but in so doing there was no uncertainty or inconsistency. The intent of the defendant, as charged in the indictment, must, of course, be proven, either by direct, positive, or independent evidence, or by such facts and circumstances as would enable the jury to draw the inference of guilt, as they legitimately are allowed to draw other inferences, from any of the facts in evidence which to their minds fairly prove its existence. The evidence in this case was, notwithstanding the lack of memory upon the part of some of the witnesses for the government, so clear as to leave no reasonable doubt in the minds of the jury as to the inferences and presumptions which naturally flowed from it, viz. that the offense as charged, in making the false entry on the books of the bank, was committed by the plaintiff in error herein with intent to deceive the bank examiner, and that the false reports made by him were made with the intent to deceive the comptroller of the currency. The charge of the court fairly, in language to which no possible exception could be taken, submitted this question to the jury. The court also properly charged the jury that "every one is presumed to intend the necessary consequence of his own deliberate act, and if you believe from the evidence that the entries described in the indictment were false, and that the defendant made, or caused them to be made, and that the necessary result of such entries was to deceive the examiner by the entries in the books, then the defendant is guilty as charged under that count." Is it not reasonable to presume that a cashier of a bank who wrongfully makes or causes such entries to be made intends the legitimate consequences of his unlawful act? Is it not manifest from the entire charge that the jury could not have been misled by the language used in another part of the charge, that "any and every false entry upon the books used in the transaction of its current business is calculated either to mislead its officers or work injury to the bank"? This was but a general statement. Another portion of the charge was so defi-

nite and direct that the jury could not possibly have been misled. Among other things, the court said:

"The counts charging the defendant with making false entries in the books of the bank allege that such entries were made, or caused to be made, by the defendant, with the specific intent on the part of the defendant to deceive any agent who might thereafter be appointed by the comptroller of the currency to examine the affairs of said association or bank. The offense charged is a statutory one, and the specific intent alleged in the indictment is a substantive or essential part, and one of the ingredients of such offense; and before you can convict the defendant on any of such counts you must find as a fact, beyond any reasonable doubt, that he not only did the acts charged, but that he did them with the specific intent on his part to deceive any agent who might thereafter be appointed by the comptroller of the currency to examine the affairs of the bank. It will not justify a conviction for you to find from the evidence, if you should be so inclined, that he did the acts charged with some other intent, no matter how wrongful it might be."

The instructions given in the following cases support the charge of the court, and also the general views we have expressed in regard thereto. U. S. v. Harper, 33 Fed. 471, 481; U. S. v. Means, 42 Fed. 599; U. S. v. Allis, 73 Fed. 165, 171. The charge must be read and considered in its entirety; and, so read and considered, it is manifest that the jury could not possibly have been misled in regard thereto.

It is argued that the court erred in not giving a correct definition of a "special deposit." The facts of this case did not call for any legal definition of a "special deposit," as that term is understood in legitimate banking business. The transactions, if they occurred as testified to by Peters, cannot, from any legal standpoint, be classed as legitimate. The intent with which an act is done is often more clearly and conclusively shown by the act itself than by any words or explanation of the actor. It is no defense to a wrongful act, knowingly and intentionally committed, that it was done with an innocent intent. It is often the case that the actions of men speak their intentions more clearly and truthfully than do their words. It is apparent, from the testimony, that the "deposit slips" were not given or received for the purpose of making an entry of any legitimate business of the bank. They were not, according to the evidence of Hedges, McCauley, and Weisbaugh, to be entered in the books of the county treasurer or city treasurer or the German-American Bank. The irregular and extraordinary method of conducting the business was resorted to, if at all, for the purpose of covering up a transaction that would not bear the light of day, and cannot be recognized, by any court, as legitimate. The money did not belong to the bank, and, if left there to be used in the manner testified to by the witnesses, could not, in any legal sense, be designated as the money of the bank, whether called a "loan" or a "special deposit." The entry on the bank's books was evidently designed and intended to deceive the bank examiner, and was, to all intents and purposes, under the most favorable light in which the transactions can be viewed, a "false entry," within the meaning of these words as used in the statute, and any report to the comptroller of the currency based upon such transactions would be a "false report."

Without further discussion, our conclusion is that the plaintiff in

error has had a fair and impartial trial; that he has been properly convicted upon the testimony; and that after a careful, patient, and exhaustive consideration of all the points made by counsel, whether herein specifically mentioned or not, we find no error in law in the admission of the evidence, or in the charge or rulings of the court, that calls for, or would justify, a reversal of the case. The judgment of the circuit court is affirmed.