UNITED STATES v. BALTIMORE & O. R. CO. (five cases).

SAME v. BALTIMORE & O. R. CO. et al.

(District Court, N. D. West Virginia.   April 19, 1907.)

Nos. 794-798.

1. CARRIERS—VIOLATION OF INTERSTATE COMMERCE ACT—REFUSAL TO MAKE SWITCH CONNECTIONS.

The provisions of Interstate Commerce Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155], making it unlawful for any common carrier engaged in interstate commerce to give any undue or unreasonable preference or advantage to any particular shipper, or to subject any particular shipper to any undue or unreasonable prejudice or disadvantage in any respect whatever, if construed to apply to the affording of facilities for shipments, do not subject a railroad company to indictment under section 10 of the act for its failure or refusal to furnish switch connections to a shipper tendering interstate traffic for transportation, although such connections are furnished to other shippers, where the indictment does not charge that those demanded are reasonably practicable and could be put in with safety and would furnish sufficient business to justify the expense of their construction and maintenance, nor that the person or company asking for the same offered to pay such portion of their cost as is usual and reasonable.

[Ed. Note.—Duties and liabilities of carriers as to furnishing facilities for transportation, see note to Harp v. Choctaw, O. & G. R. Co., 61 C. C. A. 414.]

2. INDICTMENT—DESCRIPTION OF OFFENSE—USING LANGUAGE OF STATUTE.

While the offense may be set forth in an indictment in the general language of the statute, it must be accompanied by a statement of all the particulars necessary to show the commission of the crime without uncertainty or ambiguity.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, § 293.]

3. CARRIERS—DISCRIMINATION AGAINST SHIPPER—INDICTMENT FOR FAILURE TO FURNISH CARS.

An indictment against a railroad company, based on Interstate Commerce Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155], which charges generally that defendant did knowingly and unlawfully grant, give, and practice an unreasonable and unjust discrimination in respect of the transportation of property in interstate commerce, by failing and refusing to grant, give, and furnish to a particular coal company its proper and rightful share and quota of cars and motive power, which it was justly and of right entitled to receive from said defendant,

and by granting, giving, and furnishing to certain other coal companies and other persons, firms, and corporations more than their respective shares and quota of cars and motive power. to the undue and unreasonable prejudice and disadvantage of the first named company, does not allege a violation of that part of the section relating to the giving of an undue or unreasonable preference or advantage to any particular person, company, or locality, or to any particular description of traffic; nor does it sufficiently charge that defendant subjected any particular company or any particular description of traffic to any undue or unreasonable prejudice or disadvantage, where it alleges no facts showing the rightful share or quota of cars and motive power to which the coal company charged to have been so prejudiced was entitled, or that such company at the time charged was prepared to make shipments and tendered the same and made demand for cars and motive power for their transportation in interstate commerce.

On Demurrers to Indictments and Information and Motions to Quash.

Reese Blizzard, U. S. Atty., and Emmett M. Showalter, Asst. U. S. Atty.

John G. Wilson and John Bassel, for Baltimore & O. R. Co.

GOFF, Circuit Judge. For reasons appearing in the record of these cases, on account of the disqualification of the district judge, the questions raised by the defendant's demurrers and motions to quash have been argued and submitted to me for decision. The indictments mentioned, numbered from 794 to 798, inclusive, were duly returned .by the grand jury on the 28th day of April, 1906, and the information referred to was by leave of court filed on the 24th day of October, 1906. Each of the indictments, as also the information, contains two counts. Indictment No. 794 reads as follows:

"United States of America, Northern District of West Virginia—ss.:

"In the District Court of the United States for the Northern District of West Virginia at the April Term Thereof, 1906, at Clarksburg.

"The grand jurors of the United States, impaneled, sworn and charged at the term aforesaid on their oaths aforesaid present: That on the ——— day of ———, 1905, the Baltimore & Ohio Railroad Company was and still is a corporation organized, existing and doing business under and by virtue of the laws of the state of Maryland, and was then and there duly authorized to and was doing business under and by virtue of the laws of the state of West Virginia in the said district, and that the said railroad company was then and there engaged in the operation of a railroad commonly known as the West Virginia & Pittsburg Railroad, extending from Clarksburg, in Harrison county, to Buckhannon, in Upshur county, and that the said railroad was then and there wholly situate and being in the district aforesaid, and that in the operation of the same the said railroad company was then and there engaged in and was carrying and transporting over, upon and by means thereof interstate commerce, and the said railroad company was then and there a common carrier, and as such common carrier was then and there engaged in the carrying and transportation of interstate commerce and other freights from points along the line of the said railroad and its branches within the said district to points and places within and without the state of West Virginia; and on the day and year last aforesaid there was situate on or near the line of the said railroad the mines and works of the Red Rock Fuel Company, which said company was then and there the owner of about four thousand acres of land along and adjacent to the said railroad, which said land was then and there underlain with valuable coal of merchantable quality and quantity which said coal then and there existing under favorable and profitable mining conditions, and the said fuel company had then and there and theretofore already opened

its mines upon the said coal lands and erected its mining plant and equipped the same for the mining of coal near to and adjacent to the said railroad, and was then and there ready, able and willing to mine and produce, and to continue to mine and produce, the coal from the said mine in great quantities to be carried and transported to various markets outside the state of West Virginia by means of the said railroad, and had then and there already produced and mined great quantities of coal, to wit, at least seven hundred and fifty tons, and the same was then and there ready to be so carried and transported as aforesaid, and the said fuel company was then and there justly and of right entitled to have sidings, switches, turn-outs and connections to and with the said railroad company so to enable it, the fuel company, to have the coal then and there produced and mined, and to be produced and mined, by it carried and transported by the said railroad company to the markets outside of the state of West Virginia, and the said sidings, switches, turn-outs and connections were then and there necessary to enable it to have said coal so carried and transported; and the said fuel company then and there had made due and proper application and request for the said switches, sidings, turn-outs and connections to the said railroad company. And the said Baltimore & Ohio Railroad Company being then and there engaged in the operation of the said railroad, and being then and there such common carrier engaged in the carrying and transportation of said interstate commerce by means of and upon and over the said railroad, did then and there knowingly and unlawfully practice an unreasonable and unjust discrimination in respect of the transportation of property in interstate commerce over, upon and by means of said railroad, by failing and refusing to grant and give and furnish the said Red Rock Fuel Company the said switches, sidings, turn-outs and connections, to the undue and unreasonable prejudice and disadvantage of the Red Rock Fuel Company, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America.

"Second count: And the grand jurors aforesaid, upon their oaths aforesaid, do further present on another day, to wit, on the ——— day of ———, in the year 1905, the Baltimore & Ohio Railroad Company was and still is a corporation organized, existing and doing business under and by virtue of the laws of the state of Maryland, and was then and there duly authorized to and was doing business under and by virtue of the laws of the state of West Virginia in the said district, and that the said railroad company was then and there engaged in the operation of a railroad commonly known as the Parkersburg Branch Railroad extending from Clarksburg, in Harrison county, to Buckhannon, in Upshur county, and that the said railroad was then and there wholly situate and being in the district aforesaid, and that in the operation of the same the said railroad company was then and there engaged in and was carrying and transporting over, upon and by means of interstate commerce, and the said railroad company was then and there a common carrier, and as such common carrier was then and there engaged in the carrying and transportation of interstate commerce from points along the line of the said railroad within the said district to points and places without the state of West Virginia; and on the day and year last aforesaid there was situate on or near the line of the said railroad the mines and works of the Red Rock Fuel Company, which said company was then and there the owner of about four thousand acres of land along and adjacent to the said railroad, which said land was then and there underlain with valuable coal of merchantable quality and quantity, which said coal then and there was existing under favorable and profitable mining conditions, and the said fuel company had then and there and theretofore already opened its mines upon the said coal land and constructed its mining plant and equipped the same for the mining of coal near to and adjacent to said railroad and was then and there ready, able and willing to mine and produce and to continue to mine and produce the coal from the said mine and said land in great quantities to be carried and transported to various markets outside of the state of West Virginia by means of the said railroad, and had then and there already produced and mined great quantities of coal, to wit, at least seven hundred and fifty tons, and the same was then and there ready to be carried and transported as aforesaid, and the said fuel company was then and there justly and of right entitled to have

sidings, switches, turn-outs and connections to and with the said railroad company, to enable it, the fuel company, to have the coal then and there produced and mined, and to be produced and mined, carried and transported by the said railroad company to the markets outside of the state of West Virginia, and that the said sidings, switches, turn-outs and connections were then and there necessary to enable it to have the said coal so carried and transported; and the said fuel company then and there had made due and proper application and request for the said switches, sidings, turn-outs and connections to the said railroad company. There was then and there situated the works and mines of various and divers other persons, firms and corporations on and along the line of railroads. in the said district operated by said various persons, firms and corporations, to wit, the works and mines of the Southern Coal & Transportation Company, the Century Coal Mining Company, and the Fairmont Coal Company, and others to the grand jurors unknown, with the same and like conditions and circumstances then and there and theretofore as existed and surrounded the Red Rock Fuel Company then and there, and which last-named companies, firms and corporations have theretofore been given, granted and furnished switches, sidings, turn-outs and connections with the said railroads whereon each was situate to enable each of them, respectively, to have the coal so mined and produced by each of them carried and transported by the said railroad company over and upon and by means of the railroads so operated by it to markets outside of the state of West Virginia. And the said Baltimore & Ohio Railroad Company being then and there engaged in the operation of the said railroad, and being and then and there such common carrier engaged in the carrying and transportation of the said interstate commerce by means of and upon and over the said railroad, then and there knowingly and unlawfully did practice, give and grant an undue and unreasonable preference and advantage in respect to sidings, switches, turn-outs and connections on its said railroad by giving, granting and furnishing to the said Fairmont Coal Company, the Southern Coal & Transportation Company, and the Century Coal Mining Company sidings, switches, turn-outs and connections.then and there and theretofore and by refusing and failing under said same conditions and circumstances then and there existing to give, grant and furnish to the said Red Rock Fuel Company sidings, switches, turn-outs and connections to and with the said West Virginia & Pittsburg Railroad, which the said fuel company was then and there justly and of right entitled to, to the undue and unreasonable prejudice and disadvantage of the said Red Rock Fuel Company, contrary to the form of the statute in such case made and provided, and against the peace and dignity.of the United States of America."

Indictment No. 795 reads as follows:

"United States of America, Northern District of West Virginia—ss.:

"In the District Court of the United States in and for the Northern District of West Virginia at the April Term Thereof, A. D. 1906, at Clarksburg.

"The grand jurors of the United States impaneled, sworn and charged at the term aforesaid of the court aforesaid on their oaths present: That on the ——— day of ———, 1905, the Baltimore & Ohio Railroad Company was and still is a corporation organized, existing and doing business under and by virtue of the laws of the state of Maryland, and was then and there duly authorized to and was doing business under and by virtue of the laws of the state of West Virginia in the said district, and that ,the said railroad company was then and there engaged in the operation of a railroad commonly known as the Parkersburg Branch Railroad, extending from Grafton, in Taylor county, through the counties of Taylor, Harrison, Doddridge, Ritchie, and Wood, to the city of Parkersburg, in the county of Wood, and that the said railroad with its branches was then and there wholly situate and being in the district aforesaid, and that in the operation of the same the said railroad company was then and there engaged in and was carrying and transporting over, upon and by means thereof interstate commerce; and the said railroad company was then and there a common carrier, and as such common carrier was then and there engaged in the carrying and transportation of

interstate commerce and other freights from points along the line of the the said railroad and its branches to points and places within and without the state of West Virginia; and on the day and year last aforesaid there was situate along the line of the said railroad and its branches and adjacent thereto the Pitts Vein Coal Company, the New York Mine Company, the Rosemont Coal Company, and the Fairmont Coal Company, and various and divers other persons, firms and corporations to the grand jurors unknown, each respectively engaged as shippers, and in furnishing for shipment, carrying and transportation interstate commerce and other freights over, upon and by means of the said railroad from points on the said railroad and its branches to points and places within and without the state of West Virginia. And the said Baltimore & Ohio Railroad Company being then and there engaged in the operation of the said railroad, and being then and there such common carrier engaged in the carrying and transportation of interstate commerce and other freights by means of and upon and over the said railroad, did then and there knowingly and unlawfully grant and give and practice an unreasonable and unjust discrimination in respect of the transportation of property in interstate commerce over, upon and by means of the said railroad, by failing and refusing to grant, give and furnish to the Pitts Vein Coal Company its proper and rightful share and quota of cars and motive power which it was justly and of right entitled to receive from the said railroad company for the carrying and transportation of property in interstate commerce then and there proposed and intended by the Pitts Vein Coal Company to be shipped over, upon and by means of said railroad from points on the said railroad to points and places within and without the state of West Virginia, and by giving, granting and furnishing to the said New York Mine Company, said Rosemont Coal Company, and said Fairmont Coal Company, and to the other said firms, persons and corporations situate and being as aforesaid and to the grand jurors unknown, more than each of their respective proper and rightful share and quota of cars and motive power, and more than each were respectively and of right justly entitled to receive from the said railroad company as shippers, for the carrying and transportation of property in interstate commerce and other freights over and upon and by means of the said railroad from points on the said railroad and its branches to points and places within and without the state of West Virginia, to the undue and unreasonable prejudice and disadvantage of the Pitts Vein Coal Company, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America.

"Second count: And the grand jurors aforesaid, upon their oaths aforesaid, do further present that on another day, to wit, on the ——— day of ———, in the year 1905, the Baltimore & Ohio Railroad Company was and still is a corporation organized, existing and doing business under and by virtue of the laws of the state of Maryland, and was then and there duly authorized to and was doing business under and by virtue of the laws of the state of West Virginia in the said district, and that the said railroad company was then and there engaged in the operation of a railroad commonly known as the Parkersburg Branch Railroad, extending from Grafton, in Taylor county, through the counties of Taylor, Harrison, Doddridge, Ritchie, and Wood, to the city of Parkersburg, in the county of Wood, and that the said railroad with all its branches was then and there wholly situate and being in the district aforesaid, and that in the operation of the same the said railroad company was then and there engaged and was carrying and transporting over, upon and by means thereof interstate commerce, and the said railroad company was then and there a common carrier, and as such common carrier was then and there engaged in the carrying and transportation of interstate commerce and other freights from points along the line of the said railroad and its branches to points and places within and without the state of West Virginia; and on the day and year last aforesaid there was situate along the line of the said railroad and its branches and adjacent thereto the Pitts Vein Coal Company, the New York Mine Company, and the Rosemont Coal Company, and various and divers other persons, firms and corporations to the grand jurors unknown, each, respectively, engaged as shippers and in furnishing for shipment, carrying and transportation interstate commerce and

other freights over, upon and by means of the said railroad from points on the said railroad and its branches to points and places within and without the state of West Virginia; and the said Baltimore & Ohio Railroad Company being then and there engaged in the operation of the said Parkersburg Branch Railroad Company, and being then and there said common carrier engaged in the carrying and transportation of interstate commerce and other freights by means of and upon and over the said railroad, did then and there knowingly and unlawfully give, grant and practice an undue and unreasonable preference and advantage in respect to a division, allotment, apportionment and furnishing of cars and motive power owned, controlled and used by the said railroad company upon and over the said railroad by giving, granting and furnishing to the said New York Mine Company, the said Rosemont Coal Company, and the .said Fairmont Coal Company, and to the said other unknown persons, firms and corporations situate and being and unknown, as aforesaid, more than each of their respective proper and rightful share and quota of cars and motive power, and more than each were respectively and of right justly entitled to receive from the said railroad as shippers, for the carrying and transportation of property in interstate commerce and other freights over and upon and by means of the said railroad and its branches from points on the line of the said railroad to points and places within and without the state of West Virginia; and by failing and refusing to grant, give and furnish upon due and proper request and application therefor to the said Pitts Vein Coal Company its proper and rightful share and quota of cars and motive power which it was justly and of right entitled to receive from the said railroad company for the carrying and transportation of property in interstate commerce, and then and there proposed and intended by said Pitts Vein Coal Company to be shipped over, upon and by means of said railroad and its branches to points and places within and without the state of West Virginia, to the undue and unreasonable prejudice and disadvantage of the Pitts Vein Coal Company, contrary to the form of the statute of such case made and provided, and against the peace and dignity of the United States of America."

Indictments 796, 797, and 798 are in effect similar to indictment No. 795; the only difference being as to the names of the different branches of the Baltimore & Ohio Railroad, and of the names of the coal companies located along the same, alleged to have been unreasonably discriminated against and in favor of.

The information reads as follows:

"The United States of America, Northern District of West Virginia—ss.:

"In the District Court of the United States in and for the Northern District of West Virginia, at the October Term Thereof, A. D. 1906, at Clarksburg.

"Reese Blizzard, the attorney of the United States of America for the Northern district of West Virginia, here comes and gives the court to understand and be informed: That heretofore, to wit, on the ——— day of ———, in the year of 1905, the Baltimore & Ohio Railroad Company was, and still is, a corporation, organized, existing and doing business under and by virtue of the laws of the state of Maryland, and was then and there duly authorized to and was doing business under and by virtue of the laws of the state of West Virginia in said Northern district of West Virginia; and that the Grafton & Belington Railroad Company was, and still is, a corporation, organized, existing and doing business under and by virtue of the laws of the state of West Virginia, and was then and there duly authorized and was doing business in said district; and that the said Baltimore & Ohio Railroad Company and the said Grafton & Belington Railroad Company were then and there engaged in the operation of a railroad commonly known as the Grafton & Belington Railroad, extending from Grafton, Taylor county, to Belington, in Barbour county; and that the said railroad and all its branches were then and there wholly situate and being in the district aforesaid; and that the said railroad companies then and there owned, possessed and had control of a large amount and number of cars, rolling stock and motive power, the exact

amount and number of which is to the said attorney of the United States unknown, and it then and there became and was the duty of the said railroad companies to make a fair and equitable distribution and apportionment of the cars, rolling stock and motive power so owned and possessed by them, among the persons, firms and corporations hereinafter mentioned, each of whom were then and there engaged as shippers and furnishing for shipment interstate commerce, as hereinafter stated; and that in the operation of the said railroad the said railroad companies were then and there engaged in and were carrying and transporting over, upon and by means thereof interstate commerce; and that the said railroad companies were then and there common carriers, and as such common carriers were then and there engaged in the carrying and transportation of interstate commerce and other freights from points along the line of said railroad and its branches to points and places without the state of West Virginia, to wit, to points and places in the states of Ohio, Maryland, New York and other states of the United States to the attorney of the United States unknown; and that on the day and year last aforesaid there was situate along the line of said railroad and its branches, and adjacent thereto, the Philippi Coal Mining Company, the Century Coal Company, the Southern Coal & Transportation Company and various and divers other persons, firms and corporations to the said attorney of the United States unknown, each, respectively, then and there engaged as shippers and in furnishing for shipment, carrying and transportation, interstate commerce, over, upon and by means of the said railroad from points on the said railroad and its branches to points and places without the state of West Virginia, to wit, to points and places within the states of Ohio, Maryland, New York and divers other states of the United States to the said attorney of the United States unknown; and that each of the said persons, firms and corporations were then and there producing and furnishing the said freights and interstate commerce for shipment under similar circumstances and conditions; and that the said Baltimore & Ohio Railroad Company and the said Grafton & Belington Railroad Company being then and there engaged in the operation of the said railroad, and being then and there such common carriers engaged in the carrying and transportation of interstate commerce and other freights by means of and upon and over said railroad, and it being then and there the duty of the said railroad companies to furnish to the Philippi Coal Mining Company its proper allotment and quota of cars and motive power for the shipment of freight and interstate commerce, the exact amount and number of which is to the said attorney of the United States unknown, did then and there knowingly and unlawfully grant, give and practice an unreasonable and unjust discrimination in respect of the transportation of interstate commerce over, upon and by means of said railroad, by failing and refusing to grant, give and furnish to the said Philippi Coal Mining Company its proper and rightful share of cars and motive power which it was justly and of right entitled to receive from said railroad companies for the carrying and transportation of property in interstate commerce then and there proposed and intended by it to be shipped upon, over and by means of the said railroad from points on the said railroad and its branches to points and places without the state of West Virginia, to wit, to points and places within the states of Ohio, Maryland, New York and divers other states of the United States to the said attorney of the United States unknown, and by giving, granting and furnishing to the said Century Coal Company and said Southern Coal & Transportation Company and said other firms, persons and corporations, situate and being as aforesaid, more than each of their respective proper and rightful share and quota of cars and motive power, the exact number and amount of which is to said attorney of the United States unknown, and more than each were respectively and of right justly entitled to receive from the said railroad companies as shippers for the carrying and transportation of property in interstate commerce and other freights, over, upon and by means of the said railroad from points on the said railroad and its branches to points and places without the said state of West Virginia, to wit, to points and places within the states of Ohio, Maryland, New York and divers other states of the United States to the said attorney of the United States unknown, to the undue and unreasonable prejudice and disadvantage of the said Philippi Coal

Mining Company, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America.

"Second count: And the attorney of the United States aforesaid here comes and gives the court to understand and be informed that on another day, to wit, on the ———— day of ————, in the year 1905, the Baltimore & Ohio Railroad Company was, and still is, a corporation, organized, existing and doing business under and by virtue of the laws of the state of Maryland, and was then and there duly authorized to and was doing business under and by virtue of the laws of the state of West Virginia in said Northern district of West Virginia; and that the Grafton & Belington Railroad Company was, and still is, a corporation organized, existing and doing business under and by virtue of the laws of the state of West Virginia in the said district; and that the said railroad companies were then and there engaged in the operation of a railroad commonly known as the Grafton & Belington Railroad, extending from Grafton, in Taylor county, to Belington, in Barbour county, and the said railroad with all its branches was then and there wholly situate and being in the district aforesaid; and that the said railroad companies then and there owned, possessed and had control of a large amount and number of cars, rolling stock and motive power, the exact amount and number of which is to the said attorney of the United States unknown, and it then and there became and was the duty of the said railroad companies to make a fair and equitable distribution and apportionment of the cars, rolling stock and motive power so owned and possessed by them, among the persons, firms and corporations hereinafter mentioned, each of whom were then and there engaged as shippers and furnishing for shipment interstate commerce, as hereinafter stated; and that in the operation of the said railroad the said railroad companies were then and there engaged and were carrying and transporting over, upon and by means thereof interstate commerce, and the said railroad companies were then and there common carriers, and as such common carriers were then and there engaged in the carrying and transportation of interstate commerce and other freights from points along the line of said railroad and its branches to points and places without the state of West Virginia, to wit, to points and places within the states of Ohio, Maryland, New York and divers other states of the United. States to the said attorney of the United States unknown; and that on the day and year last aforesaid there was situate along the line of the said railroad and its branches, and adjacent thereto, the Philippi Coal Mining Company, the Century Coal Company, the Southern Coal & Transportation Company and various and divers other persons, firms and corporations to the said attorney of the United States unknown, each, respectively, engaged as shippers and in furnishing for shipment, carrying and transportation interstate commerce and other freights over, upon and by means of the said railroad and its branches from points on the said railroad and its branches to points and places without the state of West Virginia, to wit, to points and places within the states of Ohio, Maryland, New York and divers other states of the United States to the said attorney of the United States unknown; and that each of the said persons, firms and corporations were then and there producing and furnishing the said freights and interstate commerce for shipment under similar circumstances and conditions; and that the said Baltimore & Ohio Railroad Company and the said Grafton & Belington Railroad Company being then and there engaged in the operation of the said Grafton & Belington Railroad, and being then and there said common carriers engaged in the carrying and transportation of interstate commerce and other freights by means of and upon and over the said railroad, did then and there knowingly and unlawfully give, grant and practice an undue and unreasonable preference and advantage in respect to a division, allotment, apportionment and furnishing of cars and motive power owned, controlled and used by the said railroad companies upon and over said railroad, by giving, granting and furnishing to the said Century Coal Company and Southern Coal & Transportation Company and to the said other unknown persons, firms and corporations situate and being as aforesaid, more than each of their respective, proper and rightful share and quota of cars and motive power, the exact number and amount of which is to the said attorney of the United States unknown, and more than each were

respectively and of right justly entitled to receive from the said railroad companies as shippers for the carrying and transportation of property in interstate commerce and other freights over, upon and by means of said railroad and its branches from points on the line of said railroad to points and places without the state of West Virginia, to wit, to points and places within the states of Ohio, Maryland, New York and divers other states of the United States to the said attorney of the United States unknown, and by failing and refusing to grant, give and furnish upon due and proper request and application therefor, to the Philippi Coal Mining Company, its proper and rightful share and quota of cars and motive power, the exact number and amount of which is to the said attorney of the United States unknown, and which it was justly and of right entitled to receive from the said railroad companies for the carrying and transportation of property in interstate commerce and then and there proposed and intended by said Philippi Coal Mining Company to be shipped over, upon and by means of said railroad and its branches to points and places without the state of West Virginia, to wit, to points and places within the states of Ohio, Maryland, New York and divers other states of the United States to the said attorney of the United States unknown, and which it was then and there the duty of the said railroad companies to furnish to the said Philippi Coal Mining Company, to the undue and unreasonable prejudice and disadvantage of the said Philippi Coal Mining Company, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

To each count of each indictment the defendant has demurred. The defendants named in the information move to quash the same. A demurrer has also been filed to each count of the information. These prosecutions are based on sections 3 and 10 of the Interstate Commerce Act of February 4, 1887, chapter 104, 24 Stat. 380, 382 [U. S. Comp. St. 1901, pp. 3155, 3160], and acts amendatory thereof. Said third section makes it unlawful for any common carrier subject to the provisions of the interstate commerce act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality; it also makes it unlawful for any such common carrier to make or give any undue or unreasonable preference or advantage to any particular description of traffic in any respect whatsoever; and it also declares it to be unlawful for such carrier to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

Which of these offenses does indictment No. 794 charge the defendant with having committed? Was it the intention of Congress, by the language used in said section 3, to render the defendant liable to a criminal prosecution for its failure or refusal to make the switch connections referred to in this indictment? It is at least questionable, but I do not find it necessary to determine that point, for, should I answer the question in the affirmative, I would still be compelled to sustain the demurrer to the indictment and to each count thereof, for the reasons I shall now state. In substance, the count alleges that the defendant did knowingly and unlawfully practice an unreasonable and unjust discrimination in respect of the transportation of property in interstate commerce over, upon, and by means of its railroad, by failing and refusing to grant, give, and furnish the Red Rock Fuel Company switches, sidings, turn-outs, and connections, to the undue and unreasonable prejudice and disadvantage of said company. The act of June 29, 1906, clearly refers to the state of facts described in this in-

dictment; but that statute is not applicable, as it was enacted subsequently to the commission of the alleged offense. That act requires all railroad companies, upon the application of any shipper tendering interstate traffic for transportation, to construct, maintain, and operate upon reasonable terms a switch connection with any private side track which may be constructed to connect with said railroad, where such connection is reasonably practicable, and can be put in with safety, and will furnish sufficient business to justify the construction and maintenance of the same; and further requires the common carrier to furnish cars for the movement of such traffic, to the best of its ability, without discrimination in favor of or against any such shipper. It also provides that, if the common carrier shall fail to install and operate such switch or connection, the shipper may apply to the Interstate Commerce Commission to have such matter investigated, the practicability of such connection determined, and the reasonable compensation that should be paid therefor ascertained. This provision of the act of June 29, 1906, seems to have been intended to cover conditions not provided for by previous legislation, and the care with which it is drawn at least indicates the character of the facts which should exist in all cases where switch connections are asked for, at the same time furnishing the substance of the allegations that an indictment charging an offense of this character should contain. Now, if it be conceded that section 3 of the act of February 4, 1887, may be construed to require railroad companies to furnish switch connections in order to prevent any particular person or company from suffering undue and unreasonable prejudice and disadvantage in the conduct of his or its business, still would it not be absolutely essential in an indictment drawn under it, alleging such undue and unreasonable prejudice and disadvantage, by refusing to make switch connections, to charge that such connections could have been reasonably and safely made, that they were practicable, and that they would have furnished the traffic to justify them from a business point of view, and also that the person or company asking for said connections was able to, and had offered to, pay the reasonable portion of the charges and expenses necessarily connected with the making and maintaining of such connections properly and usually paid by such person or company under similar circumstances? The allegation that the Red Rock Fuel Company was justly and of right entitled to have sidings, switches, turn-outs, and connections to and with the defendant's railroad does not, as is claimed by counsel, obviate the necessity of alleging that, when said company made application and request for such switches, sidings, turn-outs, and connections, they could be reasonably and profitably made, and that the company so asking for them was able and willing to provide its due share of the reasonable cost connected therewith, as has been the custom existing between such companies and common carriers. So it follows that, even if the statute referred to is applicable, nevertheless the indictment is defective in both of its counts. Besides, the second count of this indictment is bad, because of oversight or clerical error in the description of the railroad to and with which the sidings, switches, turn-outs, and connections were desired and refused; the name of the West Virginia & Pittsburg Railroad being used in said

count, instead of that of the defendant. The demurrer to indictment No. 794 will be sustained.

I do not find it necessary to discuss and dispose of a number of the questions raised and argued by counsel, relating to the demurrers to the counts of the remaining indictments, and to the information, as the conclusion I reach obviates the necessity of doing so. Nor will it be necessary to consider each count separately as concerning the points I do dispose of. The action I take regarding one applies directly to each and all of the remaining counts of each of the prosecutions referred to.

All of the counts charge that the defendant did knowingly and un-lawfully grant, give, and practice an unreasonable and unjust discrimination in respect of the transportation of property in interstate commerce, by failing and refusing to give, grant, and furnish to a particular coal company its proper and rightful share and quota of cars and motive power, which it was justly and of right entitled to receive from said defendant, and by giving, granting, and furnishing to certain other coal companies, and other firms, persons, and corporations, more than their respective share and quota of cars and motive power, to the undue and unreasonable prejudice and disadvantage of the particular coal company first mentioned. These counts do not allege a violation of that part of said section 3 relating to the making or giving of any undue or unreasonable preference or advantage to any particular person, company, or locality. If such was intended, the count is clearly bad, for it does not allege such preference, but sets out the giving and granting of "an unreasonable and unjust discrimination in respect of the transportation of property in interstate commerce," by failing to give one company its proper share of cars, while it gives the other companies more than their share of such cars, to the undue and unreasonable prejudice of the former company. It is not claimed that these counts are founded on that part of the section that inhibits a common carrier from making or giving any undue or unreasonable preference or advantage to any particular description of traffic. This part of the section relates to the property transported, and does not apply to either the method of transportation or the rate charged therefor.

Do these counts, then, charge that the defendant did subject any particular company or person, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage, in any respect whatsoever? There seems to have been an effort to include in each of these prosecutions all of the descriptive words used in referring to the various offenses created by the said third section of the act of February 4, 1887, as if thereby, most assuredly, an offense of some character would be alleged. There is certainly much in the various counts that could with propriety, and under the rules of good pleading, have been omitted. I am, however, unable to sustain the contention of counsel for defendant that each of said counts allege two separate offenses. On the contrary, it is with much tribulation, and with great doubt, that I reach the conclusion that one separate offense is particularly referred to, though I am quite sure that the facts relating thereto are not fully and sufficiently set out.

As I construe and conclude to read the first count of indictment No. 795, the defendant is alleged to have subjected the Pitts Vein Coal Company to an undue and unreasonable prejudice and disadvantage, by giving an unreasonable discrimination relative to the transportation of property in interstate commerce, by refusing to furnish said company with the cars due it, and by furnishing other companies with more than the cars due them. In reaching this conclusion, I necessarily regard the redundancy of language to which I have referred as surplusage, treating it as entirely unnecessary, and not of itself vitiating the count. The indictments I now consider, as well as the information, are, I conclude, drawn under the last clause of section 3 of said act of February 4, 1887, which, as I have said, makes it unlawful for a common carrier to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. But, while they are founded on this provision of the statute, do they with sufficient clearness, and with the particularity required in criminal procedure, describe the offenses intended to be alleged? The district attorney, claiming that the offense has been charged in the language of the statute said to be violated, insists that therefore it is sufficient. It is true that if the language of a statute, according to the natural import of the words used in it, is fully descriptive of the offense, then ordinarily it is sufficient in alleging the commission of the crime created or punished by it. Potter v. United States, 155 U. S. 438, 15 Sup. Ct. 144, 39 L. Ed. 214. The rule that an indictment for a statutory misdemeanor is sufficient, if the language of the statute is used in charging the offense, is limited to cases where such words fully set forth all the assignments necessary to constitute the offense intended to be punished, without uncertainty or ambiguity. Evans v. United States, 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830. The indictment should leave no doubt in the minds of the accused and the court of the exact offense intended to be charged, so that the defendant may not only know what he is called upon to meet, but also that a plea of former acquittal or conviction can be shown with accuracy by the record. United States v. Simmons, 96 U. S. 360, 24 L. Ed. 819; United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516. While the offense may be set forth in the general language of a statute, nevertheless it must be accompanied by a statement of all the particulars required to constitute the crime. Potter v. United States, supra; United States v. Benson, 70 Fed. 591, 17 C. C. A. 293; Peters v. United States, 94 Fed. 127, 36 C. C. A. 105; Jackson v. State, 91 Wis. 261, 64 N. W. 838.

Does the language used in this statute and in this count fully inform the defendant of the special offense with which it is charged? Does it enable the defendant to prepare its defense? The count fails to give the particulars of the alleged "unreasonable and unjust discrimination," and of the "undue and unreasonable prejudice" set forth in it. Such particulars are matters of real substance, and not of mere form. What was the proper and rightful share and quota of cars and of motive power that the Pitts Vein Coal Company was

entitled to? What was the proper and rightful share of cars and motive power that the New York Mine Company, the Fairmont Coal Company, and the other companies mentioned were entitled to? It is alleged, in effect, that the Pitts Vein Coal Company received less than its share, and that the other companies received more than their shares. To sustain this count the prosecution must show these respective quotas, and must, in order to convict the defendant, prove the capacity of each mine for output of product for shipment, in order to demonstrate that the one had less, and the other more, than their respective shares of cars and motive power. The grand jury must have had before it testimony tending to show the capacity and rating for output and shipment of the company discriminated against, as well as the like capacity and rating of the companies favored, else how could it allege that the one received less, and the others more, than their respective share of cars and motive power? In the absence of such evidence, how could the indictments have been returned? The presence of witnesses familiar with the capacity of each mine could have been easily obtained, and likely they were duly examined before the jury. Such matters, relating as they do to the very substance of the offense charged, should have been set forth in the indictment, for the defendant was entitled to be advised concerning them, in order to prepare for its defense. An allegation that such information "is to the jurors unknown" would be tantamount to admitting that there was not sufficient testimony on which to found an indictment, and that a conviction could not be secured if one were returned. It is likely true that the pleader would be unable to give the exact number of cars or the motive power the coal company was entitled at different times to receive from the railroad company; but it is certainly true that the percentage of cars and power that each company should have received, by virtue of its capacity and rating, could have been and should have been alleged, for such capacity and such rating must have been ascertained before a shortage of allotment could have occurred. The facts that I have thus referred to are necessary to constitute the offense created by the statute, and the mere conclusions of law alleged in the count will not suffice.

In the Cruikshank Case, 92 U. S. 542, 557, 23 L. Ed. 588, the Supreme Court of the United States, speaking through Mr. Chief Justice Waite said:

"In criminal cases, prosecuted under the laws of the United States, the accused has the constitutional right 'to be informed of the nature and cause of the accusation.' Amendment 6. In United States v. Mills, 7 Pet. 142, 8 L. Ed. 636, this was construed to mean that the indictment must set forth the offense 'with clearness and all necessary certainty, to apprise the accused of the crime with which he stands charged,' and in United States v. Cook, 17 Wall. 174, 21 L. Ed. 538, that 'every ingredient of which the offense is composed must be accurately and clearly alleged.' It is an elementary principle of criminal pleading that, where the definition of an offense, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species—it must descend to particulars.' 1 Arch. Cr. Pr. & Pl. 291. The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection

against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent, and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances."

It does not follow as a matter of course, and as matter of law, that because the Pitts Vein Coal Company is located along the roadbed of the Baltimore & Ohio Railroad Company, or of one of the companies it controls and operates, and because it was at some time ready and willing to mine and ship coal as interstate commerce, that it was the duty of the Baltimore & Ohio Railroad Company to furnish said coal company with cars and motive power at all times. The coal company may be ready, willing, and able to provide shipments for such cars at one time, and still be incapacitated for so doing at other times. Such, in fact, is frequently the case with many shippers of property for interstate commerce, and hence it would be useless and needlessly expensive for the common carrier to provide for such shipments, unless it had been duly advised that the shipper was prepared to ship, and required cars and power for that purpose. In my judgment the count should allege that the Pitts Vein Coal Company was at the time charged prepared to make such shipments, and that it in due time made demand on the railroad company for cars and motive power, tendering at the same time for shipment its coal for transportation as interstate commerce.

For the reasons indicated, I find it to be my duty to hold that all of the counts of each indictment, as well as both of the counts of the information, are defective.

Hence it follows that the defendants' demurrers will be sustained.